## GRIFFITH *v.* BALTIMORE & O. R. Co.

*(Circuit Court, S. D. Ohio, E. D.   December 17, 1890.)*

1. RAILROAD COMPANIES—ACCIDENTS AT CROSSINGS—NEGLIGENCE—BURDEN OF PROOF.
     The mere fact that plaintiff was injured by a train at a railroad crossing is not of itself sufficient to entitle him to recover damages therefor against the railroad company, but the burden is on him to show by a preponderance of evidence that the accident was due to some negligence on the part of the company.

2. SAME—PREPONDERANCE OF EVIDENCE—WHAT CONSTITUTES.
     By the requirement that negligence shall be established by a preponderance of evidence, it is intended that the evidence adduced to show such negligence shall make a stronger impression on the jury than that produced to rebut it, without regard to the mere number of witnesses who testify to the facts on either side.

3. SAME—CONTRIBUTORY NEGLIGENCE.
     Though it should be shown that defendant had been negligent in failing to blow the whistle and ring the bell on approaching the crossing, plaintiff cannot recover where the accident was due to his own negligence in not looking and listening for the train with a degree of care proportioned to the likelihood of such train passing at that time, and the difficulty of seeing and hearing it.

4. SAME—SIGNALS—AFFIRMATIVE AND NEGATIVE TESTIMONY—RELATIVE WEIGHT.
     Other things being equal, the testimony of the engineer and fireman of the train that the whistle was blown and the bell rung as it approached the crossing is entitled to more weight than the negative testimony of other witnesses that they did not hear either or both.

5. SAME—EXCESSIVE SPEED.
     Forty or forty-five miles an hour is not an excessive speed at which to approach a railroad crossing in the country, where the train which is running at that speed has a whistle and a bell which can be heard at the distance of a mile at least.

6. SAME—DAMAGES.
     Where there is no evidence that the injury was inflicted on plaintiff willfully and intentionally, none but compensatory damages are to be allowed.

7. SAME—PERMANENT INJURY—EVIDENCE.
     Evidence that plaintiff suffered from convulsions and epileptic fits after the injury, which he had never done before, is competent to be considered as tending to show that the injury is permanent.

8. SAME—NEGLIGENCE OF DEFENDANT—EVIDENCE.
     Evidence that after striking plaintiff the train ran to the next station without stopping is immaterial on the question of negligence before the accident, where the engineer and fireman testify that they did not see plaintiff, and there is no evidence of wanton negligence on defendant's part.

9. SAME—NEW TRIAL—NEWLY-DISCOVERED EVIDENCE.
     Affidavits on behalf of defendant that certain persons would testify that plaintiff had suffered from epileptic fits, which were sought to be attributed to his injuries, before the accident as well as afterwards, are no ground for a new trial, where those persons themselves make affidavit that such is not the fact, and that they will not so testify.

10. SAME—DIRECTION OF VERDICT.

Though there is positive evidence that the whistle was blown before the train reached the crossing, the court cannot direct a verdict for defendant where some of the witnesses testify that the whistle was blown more than 2,000 feet from the crossing, instead of within 80 or 100 rods of it, as required by Rev. St. Ohio, § 3336.

11. JUDGMENT—AMOUNT—INTEREST ON VERDICT PENDING STAY.

Where in such case there was after verdict a stay of proceedings pending motion for new trial, which motion was overruled, judgment will be entered for the amount of the verdict, with interest from the date of the verdict to the date of the judgment; such allowance being within the equity of the statute, (Rev. St. U. S. § 966.)

12. RAILROAD COMPANIES—ACCIDENTS AT CROSSINGS—IMPUTED NEGLIGENCE.

In an action against a railroad company for personal injuries at a crossing, it was shown that plaintiff, a young girl, was in a carriage with her mother, and that the latter was driving when the accident occurred. *Held* that, while the mother's negligence cannot be imputed to plaintiff, it was as much the latter's duty to suggest the necessary precautions, and to protest if they were not taken, as it was the mother's duty to take them.

At Law.   Charge to the jury.

*S. M. Hunter,* for plaintiff.

*J. H. Collins,* for defendant.

SAGE, J., (*orally.*)   This action is to recover damages against the Baltimore & Ohio Railroad Company for injuries received on the 1st of August, 1888, at Locust Grove crossing, about four and one-half miles south of Newark, by the collision of a train with the horse and buggy in which the plaintiff was then riding with her mother, who was driving.   The accident occurred about 12 o'clock at noon of that day.   The testimony of the mother is that, between 10 and 11 o'clock, she started with her daughter from their home, 12 miles from Newark, intending to go to that city.   They were in a phaeton buggy, the top of which was up, and the side curtains off, so that the view was unobstructed. When they reached "Hog Run Bridge," as it was called in the testimony, which is about a quarter of a mile from the crossing, they began, according to her testimony, to watch for the train.   She states that they were watching for the noon train.   They drove very carefully, according to her evidence.   There was no sign of the train.   Passing from the bridge, they went up a little hill, where they could see the track, and could have seen the train if it had been there; but they saw no train. Passing on up to the top of the hill, they drove carefully.   Saw no sign of the train.   At the top they stopped and listened, but heard nothing, and then drove slowly down the hill.   She testifies that at the top of the hill they were about 50 yards from the crossing; that it was near train time, or, as she expresses it, " it was very close."   Must have been 12 o'clock, she testifies, and that the noon train was due at 12.   According to this testimony, gentlemen, the mother knew that the time for the approach of the train was at hand.   Then, according to her testimony, they went down the hill slowly.   On the right-hand side, which was the side from which the train from the south would approach, there is a bank, and a field of growing corn, 10 or 12 feet high, which, she states, shut out any view of the train; that by reason of these obstructions they could not see the track nor an approaching train until, as she expressed it in her testimony, they were within a very short distance

from the track. You will remember the testimony, gentlemen, indicating, perhaps, as far as where I am sitting to that corner of the window,—about 40 feet. When the horse's two fore feet were upon the track, they saw the train coming, as she expresses it, "like lightning," within a few yards of them. Her daughter threw up her hands and said: "Oh, ma!" and that was all that was said. Instantly the horse was struck in the neck and shoulder, and thrown some 60 feet, the phaeton some 30 feet, the daughter underneath, the mother rendered unconscious. She first regained her consciousness, and then managed to assist her daughter to a house near by. It is admitted that the daughter would testify that she had no recollection whatever of any of the facts that occurred. That is not a remarkable circumstance, gentlemen. It seems to be a merciful dispensation of Providence to paralyze the faculties and the feelings, so that, so far as it has been possible to investigate the matter, the general opinion of those who have given attention to it is that, even in the most dangerous and apparently painful accidents, there may be little actual pain or suffering at the time, but rather an unconsciousness, which renders the sufferer unable, in most instances, to recollect anything that occurred. At all events, it is admitted that this plaintiff would testify that she remembered nothing whatever of the circumstances. The mother testifies that they heard no whistle; that they were listening for it; and that they heard no bell. Now, upon cross-examination, she testified that from the end of the field of growing corn,—that is, from the lower edge of the growing corn,—to the track, the distance was about equal to that from one corner of the courtroom on the other side of the hall to the corner diagonally opposite,— I suppose 40 or 50 feet; and one witness (Mr. Holtzberry) testifies for the plaintiff (he was sitting in the smoking-car as the train approached, and the window of the car where he was sitting was up) that he remembers the approach of the train to that crossing on that day; that there was a whistle just when the train crossed Hog Run bridge, (railroad bridge,) and that was all the signal that he heard; that he did not hear the bell ring. There was the testimony of other witnesses that while the train was in rapid motion it would not be possible to hear the ringing of the bell on the train, even in the smoking-car. This witness, however, testified that he put his head out; was going to look to see whether he could see a coal train, which was following the passenger train, coming behind them, with reference to which you have heard the testimony. When he first put his head out, he looked in front, and saw the horse just coming down the steep bank onto the railroad track, and then the collision occurred, and he saw two persons,—one thrown towards the train, and the other towards the side of the hill; that it was about 75 yards from the crossing that he saw what I have stated to you. If that was true, gentlemen, why, it necessarily follows, it seems to me, that those in the buggy could see him,—that is, could see at least as far back on the train as to the smoking-car,—for the very obvious reason that if I, sitting here, can see the juror sitting in the corner, he, sitting in the corner, must be able to see me; and therefore,

according to this testimony, the train was visible to the occupants of the phaeton before the phaeton reached the track. Now, gentlemen, as to the testimony in this case, you are to be the judges. It is my duty to give you such instructions concerning the law as may be necessary for the proper understanding and construction of the testimony. Whatever I may say about the testimony will be only for the purpose of enabling me to make more clearly understood what I have to say about the law, leaving to you to decide, not by what I may say, but by your own recollection, what the facts are.

The ground of recovery in such an action as this must be the negligence of the defendant. That is not to be inferred as matter of course, nor from the mere fact of the occurrence of the accident; in other words, the happening of the event does not raise the presumption of negligence on the part of the defendant. The burden of proof is upon the plaintiff, by which it is meant that it is necessary for the plaintiff to establish, by a fair preponderance of testimony, that the negligence which is required to entitle a recovery occurred. By a preponderance of testimony is not meant, necessarily, by a greater number of witnesses, but that the testimony shall fairly preponderate,—that is, make the stronger impression upon your minds. For instance, one witness may create a stronger impression upon a jury, and properly so, than half a dozen witnesses testifying to the contrary, because by the manner, candor, and intelligence of a witness his or her testimony may so impress itself upon the jury as to overcome in weight the testimony of half a dozen other witnesses. That is what is meant by a preponderance of evidence,—that it shall produce a stronger impression. Ordinarily, witnesses being equal in other respects, the number of witnesses would control; but, as I have just stated, it is not necessarily so. Now there are mutual duties attending the approach of a train and the approach of travelers where the railroad crosses the highway at grade. The law requires that the railway company, under such circumstances, shall sound its whistle at a distance of at least 80 rods, and not more than 100 rods, from the place of crossing, and that the bell shall be rung continuously until the engine passes the crossing; and the law of Ohio expressly provides that, if either or both these signals are omitted, the railroad company shall be liable for any injury or accident happening by reason thereof. I will have occasion to speak of this further on. There is a duty also upon the plaintiff in every case, and that is to exercise ordinary care and prudence in approaching a crossing, taking into account the perils to be encountered, and all the other circumstances attending the approach. The degree of care required is that which persons of ordinary care and prudence are accustomed to employ for safety under like circumstances. It is the duty of a person approaching such a crossing to look and listen, whether he be in a vehicle or on foot,—to watch for the approach of the train; and especially, gentlemen, if the person approaching knows that a train is to be expected at or about the time, is this duty of watching and of listening and of care increased, because, manifestly, the care must be according to the circumstances; and if the crossing be a dangerous

one, that only makes it incumbent upon the traveler approaching to exercise greater care. At the same time, the person approaching has a right to expect that the whistle will be sounded, as required by law, and the bell rung; and yet the failure to sound the whistle or to ring the bell would not necessarily determine the case, because there is a rule relating to what is termed " contributory negligence" that must always be kept in view in passing upon cases of this character. If the party injured and claiming damages has, by his own carelessness or negligence, contributed materially to the injury, that is fatal to a recovery, because the law will not apportion the negligence. If the injury is chargeable in part to the negligence of the plaintiff, and in part to the negligence of the defendant,—in other words, if the negligence of the defendant, although it actually existed, would not have caused the injury but for the contributory negligence of the plaintiff,—then the plaintiff cannot recover, because the law does not recognize that there can be any division,—that there can be any computation and apportionment of the degrees of negligence in such case. There is a department of the law, in admiralty, where collisions occur between vessels at sea, where it is held that, if both parties be in fault, the damages shall be apportioned; but that is an exception. On the land, whenever both parties are in fault, that circumstance is fatal to a recovery, unless it appear that, notwithstanding the negligence of the plaintiff, the defendant might have avoided the injury; and there is no testimony in this case which makes that portion of the rule applicable, so far as I remember the testimony. Now whether the whistle was sounded depends upon the weight which you give to the evidence of the witnesses in the case, *pro* and *con.* I think that the mother of the plaintiff does not testify that it was not sounded, but she does testify that she did not hear it. I do not remember myself, gentlemen, that there is any other witness in the case who testifies that the whistle was not sounded. On the contrary, according to my recollection, every witness who testified upon that subject testifies that it was sounded. Some testify that it was sounded just as the locomotive came upon the Hog Run bridge; others, and perhaps a majority, that it sounded after the locomotive left the Hog Run bridge, and was approaching the crossing; that it was a whistle of about five seconds,—one long whistle. Upon the subject of the ringing of the bell, the testimony of the plaintiff is that she did not hear it. The testimony of several witnesses is that they did not hear it. The testimony also is that it was not possible to hear that bell on the train while it was in rapid motion; the general testimony in the case being that the train was moving at from 40 to 45 miles an hour. The engineer and the fireman testify positively that the bell was rung, and, other things being equal, that testimony is entitled to greater weight than the negative testimony, because there is a rule of evidence or presumption that ordinarily a witness who testifies to an affirmative is to be preferred to one who testifies to a negative, because he who testifies to the negative may have forgotten. It is possible to forget a thing that did happen; it is not possible to remember a thing that never happened. That is a rule

recognized in the text-books, and it has been expressly recognized by the supreme court of the United States. But, after all, gentlemen, it is for you to decide whether the whistle was sounded, whether the bell was rung.

Something has been said in the course of argument with reference to the speed of the train. Gentlemen, I do not understand that it is the duty of those in charge of a railroad train to slow up upon approaching a crossing. One object of railroad passenger transportation is to accomplish a high rate of speed. The statute has prescribed the signals which are to be given, and they furnish the precaution which is ordinarily to be observed in approaching a crossing. There is a rule that when a train is passing through the streets of a city or town,—and it may apply in the immediate vicinity, where a large number of persons may be expected to be passing,—that the speed shall be slacked according to circumstances; but ordinarily the rule requires only that the proper signals shall be given. For instance, in this case, the testimony is that the whistle could be heard a distance of two or three miles, (as I recollect the testimony, certainly a distance of a mile,) which is greater than the distance between the train, when, according to the testimony, the whistle was sounded, and the plaintiff and her mother in the buggy. There is testimony that the bell could be heard for at least as far, and in the country, where ordinarily everything is quiet, and but few persons passing, the road not crowded, these signals would generally be sufficient to properly guard against danger at the crossing, if they were sounded. Now, gentlemen, I have to say to you, with reference to the approach of the plaintiff and her mother to this track, that if at a distance equal to that indicated by the mother (the line across the court-room) from the place where the horse was struck the track could be seen, and if they knew, as the mother testifies they did, that it was about the time for the train, it was unquestionably their duty to stop and listen there. The fact that between the top of the hill, at a distance of 50 yards from the track, they were at the last point where they could see the train, and from there down to the end of the corn-field they had been passing over a little piece of road where the track and the train were not visible, would make it the more necessary to stop and take the precaution of looking and listening before going on the track. Now is there any evidence in the case that they did stop, or is the evidence, on the other hand, that they continued, slowly, it is true, but nevertheless without stopping, from the top of the hill right onto the track? If that was the case, gentlemen, why, sad as the results were, the claim against the railroad company could not be maintained. It is not the mere fact of the happening of the accident that lays the foundation for a recovery. It must be based upon satisfactory proof that there was not only negligence on the part of the defendant, but that there was no contributory negligence on the part of the plaintiff. With reference to the proposition that there was contributory negligence, the burden of proof is upon the defendant, and you must be satisfied of that by a preponderance of evidence before you find that there was contributory negligence.

If you find that this accident occurred by reason of the negligence of the defendant, and that there was no contributory negligence immediately contributing to the injury on the part of the plaintiff, then you come to the question of damages. The damages in such a case as this should be compensatory; that is, they should be sufficient to make the plaintiff whole,—to compensate for the injury,—not beyond that. Nothing beyond that should ever be allowed unless the evidence satisfies a jury that there was a willful or intentional commission of the injury; and there is no testimony in that direction in this case. A proper compensation for the pain and suffering should be made, and, if damages be claimed for permanent injury, as they are in this case, the rule is that it must be reasonably certain that the injury is permanent, and that it resulted from the accident. I must say to you, gentlemen, that the facts, if they exist, that this plaintiff is suffering from convulsions, to which she never was subject before this injury; that they are brought on by any excitement, (and I think that the only testimony upon this point is to that effect;) that they continue without any sign of improvement,—would be very strong indications that the injury is permanent. There is no testimony upon that subject excepting what is offered on behalf of the plaintiff. It is said that probably the permanence of the injury can still be avoided by the operation of "trephining," as it is called, which consists in cutting out a section of the skull, lifting it, and remedying the depression of the inner table of the skull, which is supposed to cause the pressure against the brain at that locality, and to be the cause of the convulsions to which this plaintiff, according to the testimony, is subject. But, gentlemen, I need scarcely say to you that if you come to this question of damages, your finding ought to be exclusively upon the testimony; and that there is no rule of law or of reason or of right which makes it proper to give any greater damages against a railroad company than should be given against an individual in like circumstances. Your duty and mine in this case is entirely apart from any feeling of sympathy or pity. It is simply and only to do what is right under the circumstances.

But before you come to the question of damages, you must be satisfied that there is a case for damages. If, upon the testimony, you find that the whistle was sounded and that the bell was rung, that there was no negligence on the part of the defendant, why, of course, that is the end of the case. And if you find that either of these was omitted, and that nevertheless the plaintiff, or her mother without remonstrance from her, suffered or moved onto that track without stopping to look or listen, why that would be the end of the case. It is said, and said very truly, that the plaintiff would not be responsible for the negligence of her mother, who was driving. That is true, but in that event it was just as much her duty to look and listen as it was the duty of the mother, and just as much her duty to suggest that they should stop and look and listen as it was the duty of the mother to stop and look and listen, and her duty to protest if that was not done.

I have been asked to give you some charges, a portion of which I will give you.

With reference to the speed of the train, I do not think, gentlemen, that that, of itself, can be considered as tending to sustain the charge of negligence in the management of the train, as alleged in the petition. I think, as I said to you before, that they have the right to move the train rapidly. They are under the requirement, however, to give the proper signals. Of course, where the crossing is very dangerous, and the surroundings are such that the whistle is not likely to be heard, the train ought to be slowed up.

The testimony is that the train did not stop after the accident, but proceeded directly on to Newark. With reference to that, the engineer says that he did not see the horse or the wagon; did not know anything about the accident until some time after they had passed. The fireman just at the moment of striking did see the horse, and saw a piece of the shaft of the buggy fly past the window. He communicated it to the engineer. Well, gentlemen, if it were a question whether this injury was wantonly inflicted, I think that testimony would be significant. If there were anything indicating that there was any intention or any wanton disregard of the safety of these people, the fact that the train was moved right on by, without stopping it, would be proper to be considered. There is no such testimony, and therefore what occurred after the accident could hardly be said to have any bearing upon the question of negligence before the accident.

"If the plaintiff, immediately before the horse stepped on the track, could have seen the approaching train in time to stop, had she looked, the presumption is that she did not look, or, if she did look, that she did not heed what she saw, and in either case she was negligent, and cannot recover." That I give to you. It is in substance what I have already given you in charge.

"If the plaintiff could have heard the whistle sounded, and did not hear it because she did not listen for it, or, having heard it, did not heed it, she was in either case guilty of contributory negligence, and cannot recover." That is correct, also.

With reference to the sounding of the whistle, gentlemen, I think it proper to call your attention to the consideration that this was a crossing which, according to the testimony of the mother, both the plaintiff and her mother were well acquainted with. It was on the road between their home and Newark, and they passed over it frequently. Now we all know that sounds to which we are accustomed we sometimes hear without being conscious thereof,—without taking note; and in weighing the testimony as to the sounding of the whistle and the ringing of the bell it is fair to take that into account; but, on the other hand, take also into account the testimony of the mother that they were looking and watching for the train, which would tend to cause them to notice the sounding of the whistle, if it was sounded.

"The fact that this was a dangerous crossing increased the care required of the plaintiff in approaching and driving over it in proportion to the danger to be apprehended. If the crossing was extraordinarily dangerous, it required extraordinary care and caution on the part of the

plaintiff to ascertain if a train was approaching, and, failing in this, she cannot recover." That is correct, also, and you are to take into account in connection with what I have already said with reference to the fact that they were aware that it was about the time when the train was to be expected, and that that imposed upon them still greater care and caution. And then there is another instruction which I have already given you, in substance, and which I need not repeat.

These, gentlemen, are all the suggestions that it occurs to me to give to you. You may take the case, gentlemen.

### ON MOTION FOR NEW TRIAL.
#### (December 12, 1890.)

SAGE, J. The first ground upon which a new trial is asked is newly-discovered evidence. It appeared upon the trial that the plaintiff has been, since the accident which caused the injury for which she seeks recovery, subject to epileptic fits. The testimony of the physicians on her behalf tended to prove that these were caused by the depression of the inner table of the frontal bone of the skull, by concussion at the time of the accident, and consequent pressure upon the brain. The defendant now produces affidavits that several persons (naming them) have stated, and will testify, that the plaintiff was subject to epileptic fits before the time of the accident. But, on the other hand, the plaintiff produces affidavits from each one of the persons named, denying having made such statements, and denying that the facts existed to which it was said they would testify. This ground for new trial is therefore not sustained.

The next ground is that the court erred in not directing a verdict for the defendant. It is argued in support that the only negligence alleged or sought to be proven against the defendant was the failure to sound the whistle of the locomotive and to ring the bell, and that the proof was all the other way so clearly that the verdict should have been directed as asked. With reference to the sounding of the whistle, several witnesses, including the engineer and fireman, did testify that it was sounded, and, while quite a number of persons testified that they did not hear it, no one testified that it was not sounded. But some of the witnesses testified positively that the sounding of the whistle was at Hog Run bridge, which, according to the testimony, is 2,430 feet from the crossing where the accident occurred, and that it continued about five seconds, the train running at the rate of 40 miles an hour, or 56 feet per second. From the whistling-post to the crossing the distance is 1,080 feet, so that, according to that testimony, the whistle was not sounded when the train was nearer than 2,150 feet to the crossing. Section 3336, Rev. St. Ohio, provides that the engineer or person in charge of the locomotive in motion, approaching a road-crossing at grade, (and such was the crossing where the accident in this case occurred,) shall sound the whistle at a distance of at least 80 and not further than 100 rods from the place

of crossing, and ring the bell continuously, until the engine passes the crossing. Section 3337 makes the company liable in damages to any person injured in person or property by failure to give the signals as provided in section 3336. Now as to the ringing of the bell the testimony is conflicting. There were witnesses who testified that the bell was rung, and others who testified that it was not rung, and still others who testified that they did not hear it. The plaintiff and her mother, according to the mother's testimony, were looking and listening for the train as they approached the track. They knew that it was about due, and they were anxious about the crossing. They would, therefore, have been likely to hear the whistle, if sounded, or the bell, if rung. As to the sounding of the whistle, the jury were charged, in accordance with the rule laid down in the text-books and in *Stitt* v. *Huidekopers*, 17 Wall. 394, that "ordinarily, a witness who testifies to an affimative is to be preferred to one who testifies to a negative, because he who testifies to a negative may have forgotten. It is not possible to remember a thing that never existed." But, after all, that is only the statement of a rule with reference to the weight of testimony, and it would not authorize a court to determine the fact where the case was being tried to a jury. There was affirmative testimony that the sounding of the whistle was not within the distance required by the Ohio statute, and therefore not the signal required to be given to relieve the company from the charge of negligence; and there was also positive testimony that the bell was not rung as the train approached the crossing. The case was not one, therefore, in which the court could rightly have directed a verdict for the defendant.

The next ground for new trial is that the court erred in charging that the burden of proving contributory negligence was upon the defendant. It is admitted that the charge was in accordance with the general rule in the United States courts; but it is urged that this action is one under and by virtue of sections 3336 and 3337 of the Ohio Statutes. Section 3336 makes every engineer or person in charge of a locomotive engine moving upon its road, who fails to comply with the provisions of section 3337, personally liable to a penalty of not less than $50 or more than $100, and also makes the company liable in damages for such neglect, where the injury results therefrom. Counsel for defendant claims that therefore the rule of evidence must be as recognized in the state courts; that to warrant a recovery it must be shown that the failure to give signals was the proximate cause of the accident, and that the burden of proving contributory negligence is on the plaintiff. *Pennsylvania Co.* v. *Rathgeb*, 32 Ohio St. 72. The answer to this proposition is twofold: *First.* This is not a statutory action. It is true that the failure to sound the whistle and to ring the bell is alleged as negligence on the part of the defendant. But the case stated in the petition is clearly upon the common-law liability of the defendant. The statute, however, may be referred to to determine what constitutes negligence in Ohio as to giving signals on approaching a crossing. *Second.* If it were an action under the statutes, I do not think the rule relating to the burden of proof would thereby be

changed. The contrary has been held by the supreme court of the United States. *Railroad Co.* v. *Mares*, 123 U. S. 710–721, 8 Sup. Ct. Rep. 321.

The next ground for motion for a new trial is that the jury disregarded the charge of the court. I do not think this is sustained. It was conceded upon the trial that the plaintiff herself had no recollection of what occurred at the time of the accident, and therefore could not testify. She was placed upon the stand, and a question put to her; but the excitement of the situation brought an epileptic fit upon her, and it was necessary to take her from the stand, and away from the court-room. It was then stipulated that she could remember nothing about the accident. The mother, however, who was riding with her daughter, and driving, testified that they drove very slowly as they approached the track, and that both she and her daughter were continuously looking and listening. A short distance before they reached the crossing, according to her testimony, they stopped, and looked and listened. Her testimony therefore tended to prove that all the precautions that were necessary were taken by her and by her daughter, and therefore that the negligence complained of on their part did not exist.

It is further urged that the verdict is against the weight of the evidence. I have examined the stenographer's report, and am satisfied that the case was one for the determination of the facts by the jury, and that, whatever may be my own opinion as to the correct findings of fact to be made, it is my duty to leave the parties to abide by the verdict. The motion for a new trial will be overruled.

This case was tried at the June term. The motion for new trial was argued at Cincinnati, just before the present term of the court at Columbus. The verdict was for $5,000. The counsel for the plaintiff, desiring that there should be no review of this case by the supreme court, now moves for judgment for the amount of the verdict, without interest. Counsel for the defendant, on the other hand, insists that the judgment shall be with interest from the date of the verdict until the entering of the judgment. Counsel for the plaintiff claims that this court should follow the law and procedure of Ohio in matters not otherwise provided for by the laws of the United States, including the entering of judgments in cases of tort, and refers to the Revised Statutes of the United States, section 966. He refers also to section 3181 of the Revised Statutes of Ohio, which provides for interest upon all judgments, decrees, and orders of any judicial tribunal for the payment of money, but not for interest upon verdicts; and he insists that the judgment should be for the amount of the verdict, without interest. The contention of counsel for the defendant is that the provisions of section 966 of the Revised Statutes of the United States, and of section 3181 of the Revised Statutes of Ohio, with regard to interest on judgments, are substantially the same, and that the construction of the statutes should be the same. Also that, under section 5375, Rev. St. Ohio, a judgment becomes a lien on the lands of the judgment debtor within the county from the first day of the term; and so in the federal courts the judgment

becomes a lien on the lands of the judgment debtor within the jurisdiction of the court from the first day of the term at which it was rendered. *Massingill* v. *Downs*, 7 How. 760. His argument is that in Ohio, under this statute, judgments have always drawn interest from the day they become liens; quoting from the decision of the Scioto district court, 1859, (*Knible* v. *Connolly*, 1 West Law Month. 402,) as follows:

"A judgment rendered in an action pending at the first day of the term draws interest from that day, and includes interest on the debt up to that day. Judgments on confession, in actions commenced during the same term, take effect only from the day of entry, drawing interest from that day, and include interest on the debt up to that day."

*Sproat's Ex'r* v. *Cutler*. Wright, 157, (1832:) "Interest will be allowed on awards and verdicts, where payment is delayed, up to the time of judgment."

He also cites *Redfield* v. *Iron Co*., 110 U. S. 177, 3 Sup. Ct. Rep. 570; *Owens* v. *Railroad Co*., 35 Fed. Rep. 715; *Steam-Ship Co.* v. *Merchant*, 133 U. S. 375, 379, 10 Sup. Ct. Rep. 397; *New York El. R. Co.* v. *Fifth Nat. Bank*, 118 U. S. 608, 7 Sup. Ct. Rep. 23; *The Patapsco*, 12 Wall. 451.

Counsel for the plaintiff, in answer to the citation of *Steam-Ship Co.* v. *Merchant* and *New York El. R. Co.* v. *Fifth Nat. Bank*, cites *Bailey* v. *Mayor, etc.*, 7 Hill, 146, and refers to the fact that in the state of New York interest is by statute allowed from the date of the verdict. I have conferred with the circuit judge upon this question, and the conclusions in which we concur are as follows: That it is proper to allow interest on the verdict from the date of its rendition up to the entry of judgment. This was done below in *Steam-Ship Co.* v. *Merchant*, 133 U. S. 376, 10 Sup. Ct. Rep. 397, and the supreme court sanctioned it, and entertained jurisdiction. It does not appear that the practice was rested upon any New York statute. See, to the same point, *Gunther* v. *Insurance Co.*, 10 Fed. Rep. 830, where BENEDICT, J., says: "The item of interest on the judgment from the day of the rendition of the verdict to the day of entry of the judgment, amounting to some $500, may be allowed. The delay was caused by a stay of proceedings during the pendency of a motion for a new trial. This delay should not be at the plaintiff's expense. The payment of interest meanwhile may properly be deemed a condition attached to the stay, or, if not, an entry of the judgment as of the date of entering the motion for new trial, might, if necessary to avoid damages to the plaintiff, be permitted; but I consider the item of interest on a verdict within the equity of the statute, (section 966,) and for that reason taxable." See *National Bank* v. *Mechanics' Nat. Bank*, 94 U. S. 439, and *Dowell* v. *Griswald*, 5 Sawy. 24. To the same effect see *Gunther* v. *Insurance Co.*, 20 Blatchf. 390, 10 Fed. Rep. 830. In *Gibson* v. *Cincinnati Enquirer Co.*, 5 Cent. Law J. 446, (this circuit, Ohio,) the rule was laid down that where entry of judgment is delayed by acts of the opposite party, interest on the verdict is proper, whether the action is in contract or tort. If the action is upon contract, the verdict should draw interest from the first day of the term; if *ex delicto*, from the date of the rendition of the verdict.

The judgment will be entered, with interest from date of verdict. This will give the defendant the right to sue out its writ of error. Where the law will sanction it, we should so apply it as to give the losing side an opportunity of review.