### ABBITT, ADMINISTRATRIX, *v.* LAKE ERIE AND WESTERN RAILWAY COMPANY.

[No. 17,007.   Filed May 24, 1898.]

INSTRUCTIONS.—*Must Be Applicable to the Evidence.*—An instruction is not only required to state correct legal principles, but it should so state them that the jury may be able to apply them to the particular evidence to which they are germane.   *p. 513.*

NEGLIGENCE.—*Co-employe.—Imputed Negligence.—Contributory Negligence.*—Where two persons are associated together as car inspectors, and by an arrangement or agreement between them, either express or implied, it became the duty of one while the other was under a car engaged in the inspection and repair thereof, to look out, and give notice to the other of approaching danger, the relation of principal and agent exists between them in this respect, and if the former fails to perform such duty, and by reason of his neglect his co-employe is injured by an approaching train, such negligence is imputable to the latter, and in order that a recovery can be had for such injury it is incumbent upon plaintiff to show freedom from contributory negligence on the part of his co-employe.   *pp. 513, 514.*

INSTRUCTIONS.—*Invasion of Province of Jury.*—An instruction given to the jury in the trial of an action against a railroad company for damages for the death of an employe caused by defendant backing a car against another car under which deceased was at work, to the effect that if a red light was on the rear platform of the car under which deceased was at work when injured, and if you find from the evidence that a red light by night is a danger signal, and if defendant's employes knew, or might have known, that such a light, in general railway usage, so placed, was a signal of danger, then such facts made it the duty of such employes to heed it and exercise care and caution, etc., was a usurpation of the functions of the jury, where the evidence was conflicting as to whether the red light on the car at the time of the accident was a signal of danger.   *pp. 514-520.*

From the Marion Superior Court.   *Affirmed.*

*J. E. McCullough* and *H. N. Spaan,* for appellant.   *John B. Cockrum,* *W. H. H. Miller, J. B. Elam* and *F. Winter,* for appellee.

JORDAN, J.—Appellant, as the administratrix of William F. Abbitt, instituted this action in the special term of the Marion Superior Court to recover of the appellee railroad company, damages for the alleged negligent killing of her decedent. On a trial before a jury she was successful in her action, and a verdict was returned in her favor for eight thousand dollars, and over appellee's motion for a new trial, judgment was rendered upon the verdict. From this judgment appellee appealed to the general term of the Marion Superior Court, where it secured a reversal, and from the judgment of the general term, reversing that of the special term, the administratrix has appealed to this court.

The complaint upon which the action is based is in three paragraphs, and the material facts averred in each of them may be summarized as follows: By the first paragraph, it is disclosed that the plaintiff is the administratrix of the estate of William F. Abbitt, deceased; that on June 4, 1891, decedent was an employe of the Cincinnati, Hamilton & Dayton Railroad Company as a car inspector. Part of his duty as such was, every morning at about 3:45, to inspect the cars of a train which left the Union Station at Indianapolis, Indiana, at 3:55 a. m. over said C., H. & D. road for Cincinnati, Ohio, and to change a "draw bar" on a certain sleeper, which was transferred from the Vandalia to the C., H. & D. Co.'s tracks, to become a part of said train. On said date, decedent was under one of the cars of said train, as it stood in the Union Depot, inspecting the same and changing the "draw bar" or coupler, as was his duty, said train at the time not being fully made up and not coupled together, and upon the rear thereof were hung out red danger signals, as danger signals to other railway employes and the public, warning them that it was unsafe to at-

tempt to switch cars about there, or to attempt to couple the same to said train while the same was being inspected, and while decedent was performing said duty under and about them. While decedent was so engaged, certain employes of defendant, well knowing that decedent was so performing his said duty in and about said train, and notwithstanding the presence of said danger signals, carelessly and negligently backed a car against the one decedent was under and inspecting, crushing him to death. Absence of contributory negligence on the part of the decedent is alleged. Decedent was thirty-two years old, in good health, earning $1.90 per day; left plaintiff as his widow, but no child or children, and damages in the sum of $10,000.00 are demanded.

By the second paragraph it is shown that plaintiff is the duly appointed administratrix of said decedent's estate. That on June 4, 1891, decedent was in the employ of the C., H. & D. Ry. Co. as a car inspector, part of his duty as such being, every morning at about 3:45, to change a "draw bar" on a certain sleeper that was changed from the Vandalia tracks to those of the C., H. & I. in making up the morning train on said last named road, bound for Cincinnati. At said time on said morning decedent was under said car as it stood in the Union Depot on the track used by the C., H. & I. Co., inspecting the same and changing the "draw bar" or coupler, as was his duty, said train not yet being coupled together, and the sleeper aforesaid standing away from the cars constituting the remainder of said train. Said car formed the rear of said train, and had hung out upon the rear end thereof red danger lights and signals, known as "markers" and danger lights, to denote the end of the train to those coming from the rear, and to the engineer in front when running, also to warn persons in charge of trains that

there is danger in approaching such car upon which such lights are displayed. Defendant's servants at the time and place aforesaid were backing and pushing a car along the track upon which the train and sleeper under which decedent was at work was standing, and attempted to couple the same on the rear end of the car under which decedent was at work. The servants of the defendant were engaged in the employment of switching, and backed and pushed said car carelessly and negligently against said sleeper, with such force and violence as to cause the wheels thereof to run onto and over decedent, crushing and mangling him, so that he died as a result of the same. Freedom from contributory negligence on the part of the decedent, and his age, etc., are alleged.

The third paragraph alleges facts similar to the first and second, but avers that in order to change the "draw bar" and coupler, it was necessary to get under the front end of the sleeper to loosen one bar or coupler, and to put in the other bar. That according to the common usage of railway companies whose lines center in Indianapolis and use the Union Depot in their passenger traffic, and all other lines and places along said lines, the use of red lights is a signal of danger and warning, and when such lights are placed upon the rear platform and end of a car, or in other places, they are, in such positions, a signal of warning and danger to all employes of all railroads using, as aforesaid, said Union Station, and it is such signal on all other railroads along the several lines; and when such red lights are displayed, it is the duty of trainmen approaching the same to use care, and is notice that danger is near. While decedent was working under the car there was upon the rear platform and end of said car, red lights, or danger signals, and decedent, as a railway employe of experience, knew that, so placed,

were such danger signals to all who might come about said car, whether in course of duty or otherwise; and said danger signals were in use on said C., H. & D. Ry. Co.'s lines, and had been for a long time prior thereto. While decedent was at work, and when such danger signals were so displayed upon the rear end of the sleeper, certain employes of defendant, carelessly and negligently backed and pushed cars against said sleeper, without paying sufficient attention to said signal of warning and danger, and not sufficiently heeding the same, well knowing that such red light was such signal and warning, and it being their duty, in the presence of such signals, to act with care and caution, they then and there acting as trainmen and as a switching crew, that being their duty. When said car, aforesaid, was backed and pushed, it ran upon and over the decedent, crushing him to death, etc. Freedom from contributory negligence, and facts in respect to the age of the decedent are alleged, and the demand is for $10,000.00.

It may be said, we think, under the theory upon which each of these paragraphs proceed, that the wrong imputed to the defendant, and the negligence upon which the plaintiff founds her action, consist in the act of the defendant in disregarding the red lights or danger signals on the end of the car in question, and, under the circumstances, backing or pushing the car or cars against the one under which the decedent was engaged at work, as alleged, and thereby killing him. The following, in the main, may be said, we think, to be a summary of the facts disclosed by the evidence in respect to and concerning the alleged negligent killing of appellant's decedent: On and for some time prior to June 4, 1891, the Louisville, New Albany & Chicago Railroad Company, known as the "Monon" company, had a running arrangement

with the Cincinnati, Hamilton & Dayton Company, known as the "C., H. & D." company, operating the Cincinnati, Hamilton and Indianapolis Railroad, by which a solid train was run from Chicago to Cincinnati, in which passengers were carried through without change of cars. One of these trains so run was known as "Number 33." A Monon engine, with its crew, brought this train from Chicago to Indianapolis, and at a point east of the Union Station in said city, pulled it on to a "Y" and from that point backed it into the Union Station, and headed it east for Cincinnati. The Monon engine would then be detached, and an engine of the Cincinnati, Hamilton & Dayton Co. would pull the train to Cincinnati. At and before the time of the accident in controversy, the Monon company had no switching facilities of its own at Indianapolis, and consequently had a general arrangement or agreement with the Lake Erie & Western Railroad Company, appellee herein, under which all switching required by the Monon was performed by the appellee. Train number 33 was scheduled to arrive at Indianapolis daily, shortly after 3 o'clock in the morning, and always brought one sleeper for the use of Indianapolis passengers, which would be cut off and left at the yards at Indianapolis. This sleeper was usually, it seems, the rear car on the Monon train, and when it reached the "Y" heretofore mentioned, it would be uncoupled and taken to the yards, and was not backed into the Union Station with the remainder of the train. It sometimes occurred that an extra sleeper would be attached to the Monon train, to be placed in the rear of the Indianapolis sleeper. This, however, was usually an empty sleeper, being transferred from one end of the road to the other so as to be convenient when needed. When this occurred, it appears that appellee's yardmaster would

be informed by telegraph by the Monon company in regard to this extra sleeper, and directions would be given by him to the switching crew in respect to its disposition. If it was intended that this sleeper should continue with the train until it reached Cincinnati, the employes of the C., H. & D. company were informed by the Monon company, so that they could provide for the extra sleeper. At the time of the accident by which Abbitt was killed, train number 33 carried an extra sleeper, which it was ordered should be taken on to Cincinnati, and this sleeper seems to have been the rear coach of the train from Chicago to Indianapolis. Appellee's yardmaster at Indianapolis was informed by the Monon company, by a telegram, of the order in regard to the destination of this sleeper, but it appears that the Monon company failed to notify the employes of the C., H. & D. in regard to this extra sleeper. When train number 33, on the morning of June 4, 1891, reached Indianapolis, the regular Indianapolis sleeper, together with the extra sleeper mentioned, which, as stated, was in the rear of the train, was detached at the "Y," and taken by appellee's switching crew to a point west of the Union Station, at which place the crew waited until they were signaled by the switchman of the Union Railway Company that the track under the train shed was clear, and that they might enter and go upon the C., H. & D. switch and push the extra sleeper along the track to the rear end of train 33. In addition to the cars brought by the Monon from Chicago, a chair car from the Indianapolis, Decatur and Western Railroad, and a sleeper from the Vandalia road, both of which railways enter the city of Indianapolis from the west, were attached, at Indianapolis, to train 33, and were standing, it seems, uncoupled on the rear end of that train before appellee's switch engine with the extra

sleeper had come on to the C., H. & D. track. These two coaches were still separated from train 33 at the time appellee's switching crew received the signal from the station switchman to enter on to the track of the C., H. & D. The uncoupled Vandalia sleeper was the rear one of the two cars. The extra sleeper, having been the last car constituting train 33 as it was run over the Monon road from Chicago, was intended to be the last coach on the same train, which was to be taken by the C., H. & D. to Cincinnati. On the morning of the accident, appellant's intestate, William F. Abbitt, and one William Lichtsin, were in the employ of the Cincinnati, Hamilton & Dayton Railway Company as car inspectors, and had been engaged in such service for said company for sometime prior to that date. As such inspectors it was part of their duty to be present at the Union Station at Indianapolis when said train 33 arrived from Chicago and inspect the same to see if the cars were in good condition. As the Indianapolis, Decatur & Western chair car and the Vandalia sleeper became a part of train 33 at Indianapolis, the inspection required of Abbitt and Lichtsin included these two cars. The Vandalia sleeper usually carried a coupler unlike the one used on the C., H. & D. road, and therefore in order that the Vandalia sleeper might be properly coupled to train 33, it was necessary to change its coupler. This work required some three or four minutes, and was done by the two inspectors after the Vandalia sleeper was run into the Union Station, the coupler being taken out by removing the draw bar, of which it was a part, and the other coupler being taken from a box carried under the sleeping car near its center, and substituted for the one removed. In doing this work it became necessary for one of the inspectors to get under the Vandalia sleeper, between the rails of the track on which it

stood, and remove the keys which held the draw bar. The Union Station was lighted by electricity, and while one of these inspectors sat under the sleeper, removing the keys from the draw bar, the other stood on the platform near the track and held a torch carried by him, so as to give the other under the car a better light. There is evidence showing that the standard rules adopted and observed by railroads in the country require that car inspectors, or other employes, while working under a car, should protect themselves at night by displaying a blue light, and by day a blue flag, from the platform of the car under which they were at work. There is also evidence showing that not much work was done at the Union Station which required car inspectors or other employes to be under a car for any length of time, as all defects of any serious nature were repaired at the yards, and for this reason it appears some railroad companies did not use a blue flag or a blue light at the Union Station to indicate that a man was at work under a car, and it seems that the C., H. & D. Company did not resort to the use of these blue signals at all, but that two of its car inspectors would operate together. There was also evidence showing that what is termed the "Big 4" railroad system, required four of its inspectors to work together at the Union Station. On the morning in controversy it appears that Abbitt and Lichtsin began the inspection of this train 33, at about 3:40, according to the usual custom, when it was standing in the Union Station at Indianapolis. They commenced at the east end of the train, one of them passing along the north side, and the other along the south side of the train, examining the cars as they went along, sometimes placing their bodies in whole or in part, when necessary, under the cars, in order to see if everything was all right. Finding nothing wrong on

that morning with the cars first examined, they went west on the plank platform mentioned and inspected the chair car of the I., D. & W., which car was standing near, but not coupled to the train. Discovering nothing wrong with this car, Abbitt and Lichtsin proceeded next to the Vandalia sleeper, which stood uncoupled on the same track a little west of the chair car. This sleeper was found to be in good order, except that it was necessary, as usual, to change its coupler. The inspection being so far completed, the inspectors passed along on the south side of the Vandalia sleeper to the middle of this car, and then removed the coupler from the box and passed on to the east end of the sleeper, where the change of couplers was to be made. Abbitt then seated himself on the ground under the east end of this car, between the rails, and proceeded to remove the draw bar on the car. Lichtsin, leaving Abbitt in this situation, walked back to the middle of the car, picked up his torch, which he had laid down, and came and stood on the wooden walk or platform near where Abbitt was at work under the car, and held the torch so as to afford Abbitt a better light. About the time the two men had completed the inspection and started along the south side of the Vandalia sleeper with the intention of changing its coupler, appellee's switching crew, which had been for some time waiting west of the train shed, were signaled by the Union Railway switchman to back into the station on the C., H. & D. track. The crew obeyed this signal or order, and began to back or push the two sleepers which were ahead of the switch engine into the shed, at an ordinary rate, ringing the bell as they approached the Vandalia sleeper. Two of the switching crew, the foreman and his helper, stood on the east platform of the extra sleeper, which they were to couple on to the west end

of the Vandalia sleeper, and some of them had a full
view of the latter sleeper, the train shed being at the
time lighted up by electric lights.   Both of these men,
while some distance away from the Vandalia sleeper,
saw the car inspectors as the latter were passing
towards the front of the train which they had been in-
specting, and before they had attempted to change
the coupler of the Vandalia sleeper.   They knew, as
the evidence shows, that the men whom they saw
were car inspectors from the torch which they car-
ried, but had reasons to believe that these men had
completed their inspection and were going away.   The
Monon company having failed to inform the C., H. &
D. company of the extra sleeper that was to be at-
tached to train 33 on the occasion in question, the em-
ployes of the latter company. therefore believed that
the Vandalia sleeper was to be the rear end of train
33, consequently, sometime before the appellee's crew
was signaled to back into the train shed, a brakeman
of the C., H. & D. company had placed the ordinary
markers on the rear end of this car.   These markers
were lanterns, showing a red light, towards the rear
or west end, as the Vandalia sleeper then stood, and
a green light on the side facing towards the engine,
or front of the train, and they were placed or hung
between the rear platform and its roof.   The evidence
all apparently seems to agree that these markers are
used to indicate the rear end of a train when en route,
so that anyone approaching it from behind could see
the red lights and not run against the car, and also,
in order that the engineer, while running his train,
may see the green lights from his engine, and thereby
know that his train was all connected.   In addition
to these markers, it seems that the brakeman of the
C., H. & D. company had placed an ordinary brake-
man's lantern, showing a red light, on the rear of the

MAY TERM, 1898—VOL. 150.        509

Abbitt, Administratrix, *v.* Lake Erie and Western R. W. Co.

platform of the Vandalia sleeper. With these lights,
and no others, on the rear of the Vandalia sleeper, ap-
pellee's switching crew pushed the extra sleeper against
the rear end of the Vandalia sleeper, for the purpose of
coupling it on to the latter, and in order that the
automatic coupler might operate and effect a coup-
ling, it was necessary to strike the Vandalia sleeper
with some force, and in doing so, the latter car, under
which Abbitt was at work at the time, was pushed
east, running against and over him and injuring him
so as to cause his death. It seems that the deceased was
injured by the car running over him just as he was
attempting to escape from under it in response to a
warning given by Lichtsin, too late, however, to be
available to save him. The evidence discloses that
there was a contrariety of opinion among the wit-
nesses who testified in the trial court as to whether
the brakeman's red lantern on the west end of the
Vandalia sleeper was an admonition or warning to the
employes of appellee not to touch or couple on to that
car. The claim that this lantern was an ordinary red
lantern carried by a brakeman, seems not to be con-
tradicted, and it appears that sometimes this kind of
a lantern was placed inside of a car, and sometimes
set upon the rear platform during the trip, while the
train was running. A number of witnesses testified
that this lantern, placed as it was, on the rear of the
car on the morning in question, as it stood in the train
shed, had no special significance. They testified that
it added nothing to the markers which were used for
the purpose heretofore stated, and its presence on the
car at the time did not admonish or forbid appellee's
switching crew from touching or coupling to the car,
nor did it indicate that there were persons under the
car or in a position that they might be subjected to
injury by the coupling. The evidence established

that a red light of some kind was commonly used upon railroads as a danger signal after night, but there was much evidence to show that the question of its being a danger signal depended upon circumstances. That there were many positions in which a red light might be seen by an engineer and it would not require him to stop upon seeing such light. It also appeared from the testimony of these witnesses that if a red lantern was seen in the hands of a brakeman, or standing on the platform of a car at a station, or in any other position, when, under the circumstances, an engineer might have reasons to believe that he understood what it signified, or knew that it had no particular significance, he might act upon such appearances, and need not, in all cases, stop his train to make a particular investigation. There was evidence also tending to prove that a red light on the rear end of the car under which Abbitt was at the time of the accident, in connection with the markers thereon, signified nothing in addition to the latter, and that, under the circumstances, appellee's employes were not required to heed it by not coupling to the car, or to act differently than they did. There is evidence also tending to show that Abbitt and Lichtsin were associated together in making the inspection of the cars at the Union Station, not only that they might aid each other in the work, but that the watchfulness of one might protect the other from injury incident to the work in which they were engaged. In fact, Lichtsin, who was a witness in behalf of appellant, testified that when one of them was under the car it was the duty of the other to watch out for approaching cars, and to signal them down so as to protect the one under the car, and that this was his duty at the time of the accident. There is also evidence tending to show that Lichtsin, while Abbitt was under the car where he

was killed, placed himself in a position where he could not see the approaching cars as they were being pushed into the shed by appellee's employes, and the jury find this fact to be established by their answer to an interrogatory. The evidence also shows that the decedent at the time of his death was about 33 years of age, of industrious habits, and was earning from $1.75 to $1.90 per day; that he left no children, but left the appellant, Della Abbitt, as his widow, whose age the evidence does not disclose.

Among the errors assigned by the appellee on its appeal from the special to the general term was the action of the trial court in overruling its motion for a new trial, and also in overruling its motion for a judgment upon the answers of the jury to the interrogatories.

The reasons assigned for a new trial in the lower court were the insufficiency of the evidence, and the giving of certain instructions, and the refusal to give others at the request of the defendant, and that the damages are excessive. The error assigned by appellant in this court is that the court in general term erred in reversing the judgment of the court at special term. The burden, therefore, is cast upon the appellant in this appeal to show that the judgment of the court at general term, reversing the one rendered in special term, is not a correct result, under any of the questions presented by the assignment of error at the special term. If we can hold that in consideration of any of the errors presented, under the assignment at general term the judgment of reversal by that court is a correct result, then an affirmance of it by this court must necessarily follow. The question is not whether the reasons given by the court in general term for a reversal are sufficient, but it is whether its judgment should be reversed by this court, as demanded by ap-

pellant, and the judgment at special term affirmed. *Springer* v. *Byram*, 137 Ind. 15, 45 Am. St. 159.

Appellee, in the trial court, presented and requested, among others, that instruction number four in its series be given to the jury, which request, over appellee's exceptions, was refused. This instruction is as follows: "It is also the law that where two or more persons are about entering upon a railway track for the purpose of crossing over, walking upon it, or engaging in any work thereon, and the circumstances are such that one of them only can keep a lookout for approaching trains or cars, then his companion or companions relying upon him are bound to see that he discharges the duty resting upon them all, as he acts for all, and unless it be shown that all such persons have taken reasonable care to see that the vigilance required by the law is exercised, then there can be no recovery, even though the person injured is not the one who was in such situation that it was his duty to look and listen for approaching trains or cars." The refusal by the court of this instruction upon the trial seems to have been influential at the general term in securing a reversal of the judgment. In fact, no other questions seem to have been considered by that court. While it may be said that there is evidence and circumstances in the case tending to support the doctrine of imputed negligence arising out of what it is claimed the evidence shows to have resulted in respect to the association of the car inspectors in their work, and the understanding or agreement between them that when one was under a car it was made the duty of the other to watch out for approaching trains and notify his companion of their approach, or signal them down, which duty, it is claimed, the evidence discloses was incumbent upon Lichtsin, under the circumstances, and which it is said the evidence shows

that he neglected to discharge. But even though the instruction in question, as formulated, upon any view, could be said to be a correct exposition of the law, which at least may be asserted as doubtful, still it may be said that it is so framed as to present the question to the jury as an abstract proposition, and not in a manner applicable to the particular evidence in this case. To say the least, it certainly would have left the jury in doubt or uncertainty as to how it should be applied to the evidence in this case, and for this reason alone the court was justified in refusing to give it. An instruction is not only required to state correct legal principles, but it should so state them that the jury may be able to apply them to the particular evidence to which they are germane. *Judd* v. *Martin*, 97 Ind. 173.

The rule of imputed negligence is very fully discussed by the learned counsel representing the respective parties in this cause, and we agree with counsel for appellant that the extreme doctrine asserted in *Thorogood* v. *Bryan*, 8 C. B. 115, has never been sanctioned in this jurisdiction, and has been repudiated in England and by most of the courts of this country. It may, however, be affirmed as a correct doctrine, under the authorities, that if Abbitt and Lichtsin were associated together in their work of car inspection at the time of the accident, and if by any arrangement, understanding, or agreement between them, either express or implied, it became Lichtsin's duty when Abbitt was under a car upon the railroad track during the inspection or work performed by them, to look out for approaching trains or cars, and either signal them to stop or warn Abbitt of their approach, then, in this respect, and to this extent, at least, Lichtsin might be said to have been serving the former, and

under such circumstances the relation of principal and agent in this regard could be said to exist between them, and if Lichtsin neglected to discharge the duty so imposed upon him, and thereby contributed to the accident in question, such negligence, in legal contemplation, would be the negligence of Abbitt, and justly imputable to him.   Or, in other words, if, under the circumstances, at the time of the fatal accident, Abbitt attempted or undertook to exercise the care which the law exacted of him through the agency of Lichtsin, then it would be incumbent upon the plaintiff in this action to show, at the time of the accident, freedom from contributory negligence on the part of Lichtsin.   The following authorities, and others, support this doctrine: *Town of Knightstown* v. *Musgrove*, 116 Ind. 121, 9 Am. St. 827; *Cincinnati, etc., R. W. Co.* v. *Howard*, 124 Ind. 280, 19 Am. St. 96; *Chicago, etc., R. R. Co.* v. *Spilker*, 134 Ind. 380, on p. 403 of the opinion, and cases there cited; *Brannen* v. *Kokomo, etc., Gravel Road*, 115 Ind. 115, 7 Am. St. 411; Beach on Contributory Negligence (2nd. ed.), section 103; *Minster* v. *Citizens R. W. Co.*, 53 Mo. App. 276; *Puterbaugh* v. *Reasor*, 9 Ohio St. 484; *Nesbit* v. *Town of Garner*, 75 Ia. 314, 9 Am. St. 486, 39 N. W. 516; *City of Joliet* v. *Seward*, 86 Ill. 402, 29 Am. Rep. 35; 4 Am. and Eng. Ency. of Law, p. 82, section 38.

The instructions given by the court do not seem to have advised the jury in regard to this feature of the law, which, we think, under the evidence and circumstances, may be said to have been applicable, but, passing this question, we next consider the fourth instruction in the series given by the court on its own motion.   This instruction counsel for appellee particularly and strenuously assail.   The charge in question deals with two subjects.   By the first part, the court endeavored to define in a general way the legal

rights and obligations of the deceased and appellee at the time of the accident, and this part is as follows: "If the deceased, William Abbitt, and the car inspector working with him were at the time of the injury to Abbitt engaged as employes of the Cincinnati, Hamilton and Dayton Railroad Company, in discharge of their duties as inspectors of trains of cars rightfully standing on the tracks of the Union Railway Company, then such car inspectors were at the place they were so engaged rightfully and not trespassers. So, also, if the employes of the Lake Erie & Western Railway Company were under proper orders backing cars into the Union Station on the same sidetrack, rightfully, in obedience to orders, then such employes were properly upon the track. Under such circumstances, where two or more parties have the right to use the same railroad track for certain purposes, it is the duty of individuals about to cross such a track, or working on or about it, to be on the lookout for approaching trains of cars, and to act upon the assumption that such cars may come at any time. It is the duty of such persons to look and listen vigilantly for approaching trains of cars at such times and places as are reasonably likely to give them timely warning as to such train or car, and enable them to secure their safety. And if there is a failure to discharge this duty, then there can be no recovery for injury inflicted by such train or cars, even though the persons in charge thereof are negligent; and this, for the reason that, in order to recover in such case, there must be present a case of unmixed negligence, and not a case where there was negligence on both sides. As it is sometimes put, where both parties are to blame, there can be no recovery on the part of either."

Counsel for appellee criticise this part of the charge

for the reason, as they claim, that it ignores all questions relative to the contributory negligence of Lichtsin, which they claim the evidence discloses. But without stopping to consider the objections urged in this respect, we have carefully examined that part of this instruction which deals with the question in regard to the light on the car at the time the deceased sustained his fatal injury. This portion is as follows: "The presence of lights on the car under which it is claimed Abbitt was working at the time he is alleged to have been injured, if such lights were shown to have been there, is of no significance in this case, unless it is further shown, as alleged in plaintiff's complaint that such notice was notice to the employes of the defendant company that it was unsafe to couple cars to the car bearing such lights in the manner in which it is claimed it was done in this case. If such lights were not a warning against so coupling to a car bearing them, it does not matter, so far as this case is concerned, what else they may have indicated; *but, if you find from the evidence in this case, that a red light by night is a danger signal, and known to be such generally by railroad employes engaged in the business of running trains and switching on the railroads about and in the city of Indianapolis, and if you further find that such a red light was placed upon the rear platform of the car under which the deceased was at work, as alleged, when he was crushed and killed, as alleged, and that the servants of the defendant knew before the accident to the deceased that the red light was displayed on the rear platform of the car in question, and if such employes knew or might have known by the exercise of reasonable care, that in general railroad usage such a red light so placed meant danger, and was a signal of danger, it was then and there their duty to heed such signal and to act with*

*care and caution in its presence, although they may not at the time have known what the particular danger was."* (Our italics.)

It is apparent, we think, in consideration of the issues and the evidence in this case bearing thereon, that the court in giving this latter part of the instruction usurped the rights of the jury, and invaded their province. If, however, it could be said in its favor that it did not invade the functions of the jury, it is certainly open to the objections that it is contradictory, and thereby misleading, and is calculated to leave the jury in doubt as to the law upon the question involved, and this alone would condemn it. Appellant's theory of the case was that the lights on the car under which the deceased was at work at the time of the accident were notice or warning to appellee's servants that it was unsafe to couple to the car, and hence their act in doing so, after being so admonished or warned, was negligence. It is true that there is evidence tending to support appellant's theory in this respect, but, upon the other hand, there is evidence fully tending to rebut it. A number of witnesses, who are said to be experts in regard to the significance of a red light as employed on cars in the railway service, testified upon the trial. All the evidence seems virtually to agree that the green and red markers which had been placed upon the rear end of the car in controversy as it stood in the Union Station, were used to indicate the rear of the train, when running, and also to signify to the engineer that his train had not parted. The witnesses may be said virtually to have agreed also that a red light by night, as a general rule, in railway circles about Indianapolis and elsewhere, was recognized or known as a danger signal, but there was considerable evidence going to show that a red light at night did not mean danger, under all circumstances. Much evi-

dence was introduced by appellee tending to prove that the red light resting on the rear of the car in question, as it stood at the time of the accident, was not significant of any danger, and that appellee's employes, under the circumstances, were not required to heed it as a danger signal, warning them not to touch or couple to the car. That it was not their duty, under the particular circumstance, to exercise any other or different care or caution than they would have been required to do had the red light not been displayed in connection with the markers. There was evidence tending to prove that the red lantern of the brakeman on the car, along with the markers, added nothing by way of significance to the latter; that it simply served to better mark the rear end of the train, but did not signify that any one was around or about the car in a position of danger at the time. The mooted question, under the evidence, in respect to the light, was not whether a red light by night, in railway usage, was employed as a signal of danger, but whether the particular red light on the car at the time, in connection with the markers, indicated anything different than the latter did, thereby making it the duty of appellee's switching crew to give heed thereto and not couple to the car. The question in issue between the parties, under the evidence given by each, was whether appellee's switching employes ought to have heeded this light and exercised care by not coupling to the car; but the court, after stating certain general facts, if found to be true, tells the jury what inference they shall draw from these facts. The rule is well settled that it is a usurpation of the functions of the jurors for the court to tell them what inferences or conclusions they ought to draw from a given fact or series of facts. *City of Columbus* v. *Strassner,* 138 Ind. 301, and authorities there cited.

Abbitt, Administratrix, *v.* Lake Erie and Western R. W. Co.

The court, by the latter part of the charge in dispute, in effect, told the jury that if a certain statement of facts was proved—that is to say: That if a red light by night is a danger signal, and known to be such by railroad employes, and such a red light was on the rear platform of the car under which the deceased was at work when injured, and if appellee's employe knew, or might have known, that such a light, in general railway usage, so placed, was a signal of danger, then, such facts made it the duty of such employes to heed it, and exercise care and caution, etc. The question of the duty of appellee's employes to give heed to the light in controversy, was not one, under the circumstances, that the court had the right to determine, upon the series of facts which it gave or stated to the jury, but it was one of which the jury was the arbiter, upon the consideration of all the evidence that had any bearing thereon. It will be observed that the court confines its statement of facts to the red light alone, separating it from the markers which seem from the evidence to have been quite a feature in the case, when taken in connection with the red lantern of the brakeman. Under the evidence, that part of the charge in respect to the lights in controversy is so clearly wrong that nothing can be said, we think, in its support. From an examination of the record it does not appear, nor can it be said, that this charge did not injuriously affect the appellee. Other questions are presented relative to the sufficiency of the evidence, and in respect to the giving and refusal of other instructions, and denying the motion for a judgment upon the answers to the interrogatories, notwithstanding the general verdict, and also that the damages assessed are excessive, but as the judgment of the general term reversing that of the special term must be affirmed for the error in giving instruction

number four, we pass these without consideration, as they may not again arise on another trial. It follows, by reason of the error mentioned, that the judgment of the general term, reversing that of the special term, was a correct result, and is, therefore, affirmed; and the judgment of the special term is reversed, and the cause is remanded to that court, with instructions to grant the defendant, appellee herein, a new trial.

McCabe and Howard, JJ., dissent.

### DISSENTING OPINION.

HOWARD, J.—I must dissent wholly from the conclusion reached by the majority of the court in this case. If the widow of a railroad employe may not recover for his death, under circumstances such as those disclosed in the record before us, and abstracted in the principal opinion, it is difficult to conceive of a case in which she could recover.

The errors assigned on the appeal from the special to the general term of the court below were: The overruling of the motion for a new trial, the overruling of a motion for judgment on the answers of the jury to interrogatories, and the insufficiency of the complaint.

The general term reversed the judgment at special term under the first assignment or error, giving as a reason for such reversal that the court at special term had refused to give the jury the following instruction, asked by the defendant in the trial court, the appellee on this appeal: "Fourth. It is also the law that where two or more persons are about entering upon a railway track for the purpose of crossing over it, walking upon it, or engaging in any work thereon, and the circumstances are such that one of them only can keep a lookout

for approaching trains or cars, then his companion or companions relying upon him, are bound to see that he discharges the duty resting upon them all, as he acts for all: and unless it be shown that all such persons have taken reasonable care to see that the vigilance required by the law is exercised, then there can be no recovery, even though the person injured is not the one who was in such situation that it was his duty to look and listen for approaching trains or cars."

The end proposed to be attained in requesting this instruction was that the jury should be informed that if the negligence of Lichtsin, if any, contributed to the injury of Abbitt, then such negligence of Lichtsin should be attributed to Abbitt as if it were his own, and no recovery could be had from the appellee company, whether the company were guilty of negligence or not.

I do not think the instruction correctly states the law; and I do not understand that the majority of this court are of opinion that the instruction was applicable to the facts in this case, even if it could be applicable to the facts of any possible case.

When two or more persons are about to enter upon a railroad track, it is the duty of each to look and listen for approaching cars; but it is not generally true that if one of such persons neglects his duty so to look or listen, his negligence can be imputed to the others. It is usually quite enough for a person to be responsible for his own negligence, without being called upon to answer for the negligence of some one else.

As well said by Judge Mitchell, in the *Town of Knightstown* v. *Musgrove*, 116 Ind. 121, 9 Am. St. 827: "One who sustains an injury without any fault or negligence of his own, or of some one subject to his

control or direction, or with whom he is so identified in a common enterprise, as to become responsible for the consequences of his negligent conduct, may look to any other person for compensation whose neglect of duty occasioned the injury, even though the negligence of some third person, with whom the injured person was not identified, as above, may have contributed thereto."

It will not be said in this case, that Lichtsin was the agent of Abbitt, or subject to his control or direction. Neither was Abbitt so identified in a common enterprise with Lichtsin as to become responsible for any negligent conduct of which Lichtsin might be guilty. It would not be claimed that if some person were injured by Lichtsin's misconduct, that the relations of Lichtsin and Abbitt were such that the injured person might recover of Abbitt. They were simply co-employes, each responsible to the common employer, but not otherwise responsible for the faults of one another.

It is, of course, true, in the case of co-employes, in relation to their employer, or at least, was so, at the time of this accident, that if one employe were injured by the negligence of another, there could be no recovery against the employer; for the negligence of his co-employes was one of the risks which the employe undertook as a condition of his service. But, even in such a case, if the injury should be in part due to the negligence of the employer himself, such employer could not escape liability for his own wrong, no matter what might have been the negligence of the co-employe. *Rogers* v. *Leyden*, 127 Ind. 50.

Still less could a third party, as the appellee company in this case, escape liability for its own wrongs by charging negligence against one of the co-employes of another company. Such liability could be avoided

only by showing that the defendant company was itself not negligent, or else by the failure of the injured party to show that he was not himself negligent. See *Cray* v. *Philadelphia, etc., R. R. Co.*, 23 Blatchf. 263, 24 Fed. 168, 22 Am. and Eng. R. R. Cases, 351; *Perry* v. *Lansing*, 17 Hun 34.

The gist of the instruction, as applicable to the facts of the case, if at all applicable, is as follows: Where two or more persons enter upon a railroad track for the purpose of engaging in work thereon, but the circumstances are such that only one of them can keep a lookout for approaching trains, then his companion or companions relying upon him are bound to see that he discharges the duty resting upon them all, as he acts for all.

This instruction, while by its form, apparently seeking to avoid the question of agency, yet does, in reality, imply that the persons so engaging together at work are mutual agents of one another.

I have gone carefully over all the cases cited by counsel in support of their contention in favor of the instruction, and in so far as these cases are authorities in this jurisdiction, the relation of agency was in each case shown to exist between the parties.

In *Minster* v. *Citizens R. W. Co.*, 53 Mo. App. 276, cited by counsel to show distinctly "what must be regarded as a joint undertaking," where questions of negligence are concerned, the decision was as follows: "When the negligence of a gripman of a street railway car in the operation thereof and the negligence of a third person concur in causing injury to the conductor of the car, and the gripman is under the direction and control of the conductor, his negligence will be imputed to the conductor so as to debar the latter from recovering for the injury from such third person."

There is no doubt of the correctness of this holding. It has always and everywhere been held that one is responsible for the acts of his agent, done in the course of his employment, still more, as in this case, where "the gripman was under the direction and control of the conductor."

In the case at bar, however, there is nothing to show that Lichtsin was under the direction or control of Abbitt.

In *Puterbaugh* v. *Reasor,* 9 Ohio St. 484, Puterbaugh intrusted one Reddick "with the possession, custody, and care of his team." Reddick left the team and engaged in a fight with Reasor, at which time the team became frightened and ran away, and one of the horses was killed. The suit was by Puterbaugh against Reddick and Reasor for the value of the horse. The court declined to determine the relation sustained by Puterbaugh with Reddick, but held that Puterbaugh having entrusted Reddick with his team, and the injury having resulted from the negligence of Reddick in the care of the team, Puterbaugh must look to Reddick alone for a remedy. This is certainly a question of agency. Puterbaugh having constituted Reddick the custodian of his team, cannot recover from a third party for an injury resulting from the fault of his own agent. No question as to a "common enterprise" between Puterbaugh and Reddick is considered by the court.

*Griffith* v. *Baltimore R. R. Co.,* 44 Fed. 574, which was a crossing case, is directly against the contention of counsel: "It is said, and said very truly," declared the court in that case, "that the plaintiff would not be responsible for the negligence of her mother, who was driving. That is true, but in that event it was just as much her duty to look and listen as it was the duty of her mother, and just as much

her duty to suggest that they stop and look and listen as it was the duty of the mother to stop and look and listen, and her duty to protest if that was not done." This case states the true doctrine on this matter: It is the duty of each person to take due care, but neither person, unless the relation of agency exists, is responsible for the want of care on the part of the other.

The Massachusetts case, *Allyn* v. *Boston, etc., R. R. Co.,* 105 Mass. 77, cited by counsel to show that a person riding in a carriage is responsible for the negligence of the driver, is itself dependent for authority upon *Thorogood* v. *Bryan,* 8 C. B. 115. The doctrine of that case has long since been repudiated in England, *Mills* v. *Armstrong,* 13 App. Cas. 1, and it has never been sanctioned by this court. *Miller* v. *Louisville, etc., R. W. Co.,* 128 Ind. 97, 25 Am. St. 416. Even in Massachusetts the doctrine of *Thorogood* v. *Bryan* has been greatly modified. *Randolph* v. *O'Riordon,* 155 Mass. 331, 29 N. E. 583.

In the Texas case cited, *Johnson* v. *Gulf, etc., R. W. Co.,* 2 Tex. Civ. App. 139, 21 S. W. 274, though that state is also one of the few inclined to follow the rule of *Thorogood* v. *Bryan,* the court decided simply that "If deceased was blind so as to be unable to take care of himself, and of his own volition confined himself to the care of his father, the negligence of such custodian should be imputed to him; in such case he would be his agent."

The case of *City of Joliet* v. *Seward,* 86 Ill. 402, also turned on the question of agency.

The case of *Nesbit* v. *Town of Garner,* 75 Iowa 314, 39 N. W. 516, the remaining case relied upon by counsel, also turned on "the general doctrine that the principal is bound by the acts and conduct of his agent." And the court adds: "If [the principal] suffers an in-

jury through the negligence of another, but to which the negligence of his servant, or agent, while engaged in the business of his employment, contributes, there can be no recovery. But the relation of principal and agent must exist in fact."

Thus all the authorities except those based on the discredited case of *Thorogood* v. *Bryan,* relied upon by counsel, and cited to show that Abbitt and Lichtsin were engaged in a common enterprise, and each responsible for the negligence of the other, are shown on examination to be based on the relation of agency, and not upon an engagement in a common enterprise. But it is not even suggested that Lichtsin was the agent of Abbitt for any purpose, and indeed he was not.

Much has been said in the books, in a general way, as to persons engaged in a common enterprise, so that each should be responsible for the acts of all the others, but the illustrations given are few. One instance is that of a picnic party, the vehicle in which they rode being driven by one of the company. But there they had united in selecting him for that office, and he was in effect their agent for that work, and they were consequently responsible for his negligence as driver. And see Beck v. East River Ferry Co., 6 Robt. (N. Y.) 82; also *Omaha, etc., R. W. Co.* v. *Talbot,* 48 Neb. 627, 67 N. W. 599.

Wherever it is held that one person is responsible for the acts of another, as being engaged with him in a common enterprise, it will be found that the relation of agency, express or implied, exists. What is done by one is the work of all. This is so even in a criminal conspiracy, to which such joint enterprise is sometimes likened. The co-conspirator, the aider, abetter, accomplice, or accessory, are each engaged in doing their part toward the common wrong; and

each of them, in a manner, calls upon every other member of the conspiracy to bring about the result sought by all. It is a partnership in wrongdoing in which each member is at once principal and agent.

In the last analysis, every man is responsible for his own conduct solely. When it is said he is responsible for the acts of his agent, it is but to say that he has appointed the agent to take his place and act for him, and has thus assumed all responsibility for his appointee's acts. As said in the Iowa case, *Nesbit* v. *Town of Garner, supra,* "The relation of principal and agent must exist in fact."

But in the case at bar there was between Abbitt and Lichtsin no element of agency. They were fellow workmen, responsible only to their employer. To the employer, they had, as a part of their contract of employment, assumed the risk of one another's negligence. To the rest of the world they were independent; and no third person who should do either of them any wrong could shield himself by showing that the other was at fault: each was responsible for his own faults only.

Moreover, even if the instruction were correct as an abstract proposition of law, which it was not, it was certainly not applicable to the facts in this case. Abbitt and Lichtsin were car inspectors. One walked down one side of the train and the other down the other side, each examining the cars as they went along . When this service was ended, Abbitt, as required by his duty, went under the car to change the couplings. To enable him to see to do his work, Lichstein stooped down and held his torch to give light to the man under the car. The evidence shows that both men when so engaged had a right to rely on the signals placed on the rear of the car, and to rely on every other employe in the station doing his duty.

No negligence whatever is shown on the part of either Abbitt or Lichtsin.   The court at special term, therefore, rightly refused to give the instruction.

In Elliott's Gen. Prac., section 817, the author, in speaking of the fallacy of incomplete discrimination, says: "This form of the fallacy [applying a general rule to a particular case] often misleads counsel in the preparation of instructions, for, without justly discriminating differences, they state a general principle, correct in the abstract, but which does not fit the case in hearing.   A rule may be relevant to one state of facts and entirely irrelevant to another state of facts."

But even more closely in point than any of the cases cited by counsel is *Kentucky, etc., Bridge Co.* v. *Hall*, 125 Ind. 220, where almost the exact question here discussed was before this court, and it was there held, that:   In an action by an employe of a railroad company against another corporation for damages for personal injuries, it is not necessary to allege that the fellow servants of the plaintiff were not guilty of negligence contributing to the injury.

In the case at bar, as we have already seen, Lichtsin himself was not negligent.   He was engaged in his duty, stooping down under the car and holding his torch so that Abbitt could see his work.   The rule that applies to a traveler about to cross a railroad, has no application to a workman upon the road. While the latter must also use reasonable care, proportioned to the dangers incident to his work, yet his duty requires him to give his attention to this work.   It is for that he is employed.

As said in *Shoner* v. *Pennsylvania Company*, 130 Ind. 170, so may we say of each of the inspectors in this case:   "He was on the road rightfully, and in the discharge of duty, and while he was not absolved from

Abbitt, Administratrix, *v.* Lake Erie and Western R. W. Co.

the necessity of being vigilant, and careful to avoid danger, he had a right to rely, also, to some extent, on the care and vigilance of others engaged in using the same road."

In *Kellogg* v. *Chicago, etc., R. W. Co.*, 26 Wis. 223, 7 Am. Rep. 69, it was held that, in the exercise of his lawful rights every person has a right to presume that every other will perform his duty and obey the law, and it is not negligence for him to assume that he is not exposed to danger which can only come to him through a disregard of law on the part of some other person. A like holding was made in *Brown* v. *Lynn*, 31 Pa. St. 510, 72 Am. Dec. 768, that a party is not bound to guard against the want of ordinary care on the part of another; he has a right to presume that ordinary care will be used. And in *Langan* v. *St. Louis, etc., R. W. Co.*, 72 Mo. 392, that, negligence is not imputable to a person for failing to look out for danger when under the surrounding circumstances he has no reason to suspect any.

In *Jordan* v. *Chicago, etc., R. W. Co.*, 58 Minn. 8, 49 Am. St. 486, 59 N. W. 633, it was held, that the rule that one is guilty of negligence who attempts to cross a railroad track without looking and listening, does not apply to the case of one who is employed in a railroad yard, and whose duties frequently make it necessary for him to go upon the tracks.

So in the *Indianapolis, etc., R. W. Co.* v. *Carr*, 35 Ind. 510, where it appeared that one Gill was at work upon a railroad track and, as in the case at bar, a train was backing, and the bell was ringing, and someone said "Look out!" when Gill, instead of stepping back, for some cause, stepped forward on the track, and was struck and killed. The court held that an instruction was properly refused which charged that if the de-

ceased might have seen the train by looking up it was his duty to do so; and if he failed to look up he was guilty of negligence. "He is not to be charged with negligence," said the court, "because he did not, when suddenly startled by the cry of danger, or by the near approach of the train, do exactly what one not exposed to such peril might think he might or ought to have done."

In *Bucklew* v. *Central Iowa R. W. Co.*, 64 Iowa 603, 21 N. W. 103, the supreme court of Iowa, in speaking of the rule requiring that one who is about to cross a railroad track is required to "stop, look and listen," well says: "Such rule should not be strictly applied to an employe who is engaged in making up trains which must, in a great measure, require his undivided attention. The traveler looks, listens and crosses the track, and his duty is ended. This is not so with an employe engaged in making up trains. For it is undoubtedly true that frequently several cars are to be uncoupled, and others coupled to the train. Considerable time is therefore required. If an employe so engaged were absolutely required to look and listen for approaching trains, or unexpected movements of the train in his charge, his usefulness would be greatly impaired. We think the question as to the duty of such an employe to look and listen for the movements of trains before he steps or walks on the track must be left to the jury to determine." Citing, *Ominger* v. *New York Central R. R. Co.*, 4 Hun 159; *Snow* v. *Housatonic R. R. Co.*, 8 Allen 441, 85 Am. Dec. 720; *Indianapolis, etc., R. W. Co.* v. *Carr, supra; Crowley* v. *Burlington, etc., R. W. Co.*, 65 Iowa 658, 20 N. W. 467.

Both Abbitt and Lichtsin, with the red lanterns hanging on the west end of the car under which they were working, had a right to rely on the usage which

made lanterns so hung markers to indicate that this was the end car of the train, and to warn all persons to refrain from running any car in contact with it. They had also a right to rely upon the extra red lantern placed on the rear platform as a danger signal, and that all persons handling cars in the depot would take notice accordingly.

In addition, the evidence shows that the brakeman was standing near by, watching until the inspectors should have changed the coupler, in order to give to the engineer of train 33 the signal to back up and couple the two rear cars. The inspectors could have no cause to believe that any other car was to be attached to that under which they were working; and still less to think that switchmen working in the same station would run a car upon their track, and couple to their train, without giving any notice or receiving any permission.

Neither Abbitt nor Lichtsin, therefore, was negligent; so that the instruction refused was inapplicable to the circumstances of the case, even if it were otherwise a correct statement of the law.

What is said by counsel for appellee in relation to other instructions is sufficiently covered by what is said above.

It is argued that by instructions given and refused, the court did not present to the jury the theory of appellee as to the duty of Lichtsin to keep a lookout for danger while Abbitt was under the car. Even if errror was shown in the action of the court in this regard, it would be harmless, for the reason, as we have seen, that Lichtsin was not negligent, and because, even if he were, such negligence could not be imputed to Abbitt. Counsel make much of the circumstance that Lichtsin admitted, on cross-examination, that it was his duty to watch for danger, saying, "Yes, sir,

a fellow has got to look out." But Lichtsin's evidence also showed clearly that he did not see the car backing in, for the reason that his duty required him to stoop down and hold his torch under the car so as to give light to Abbitt at his work.

But, as a matter of fact, the court did fully charge the jury as to the duty of both Lichtsin and Abbitt to look out for danger. In the fourth instruction given by the court, the jury were told that if Abbitt and Lichtsin were rightfully at work upon the track, it was yet their duty "to be on the lookout for approaching trains of cars, and to act upon the assumption that such cars may come at any time. It is the duty of such persons to look and listen vigilantly for approaching trains of cars at such times and places as are reasonably likely to give them timely warning as to such train or car, and enable them to secure their safety, and if there is a failure to discharge this duty, then there can be no recovery for injury inflicted by such train or car, even though the persons in charge thereof are negligent." If there was any error in this instruction, it was, as authorities above cited abundantly show, that it was too favorable to appellee. From the situation in which Lichtsin and Abbitt were placed, and particularly the situation of the uncoupled car under which they were at work, they had a right to rely upon the assumption that everyone about the depot would also do his duty, especially as to the track where they were engaged, in which case there could be no danger to them.

But while it thus appears that the reason given by the court in general term was insufficient for the reversal of the judgment of the court in special term, yet, as decided in the case of *Springer* v. *Byram*, 137 Ind. 15, 45 Am. St. 159, the question is not whether the reason given for the reversal was good, but

whether the reversal itself was right. It becomes necessary, therefore, to consider also the other errors alleged against the correctness of the rulings and judgment of the trial court.

It is claimed by counsel that the record fails to show any negligence on the part of appellee. Such negligence, however, sufficiently appears from what has been already written. Indeed, it is not necessary to go outside the evidence of the foreman and helper on appellee's switch train to be convinced that the negligence was gross.

The foreman of the crew, although he had had charge of the switch engine for four months, had never before had occasion to run a car in on the track for this train. He had reason, therefore, to know that the coming of such a car would be quite unexpected by the crew of the C., H. & D. train. If he needed evidence to convince him that the car which he was pushing in was not expcted on this morning, he would find it in the markers which he saw hung up on the rear of the Vandalia car, to show that that car was to be the last on the train. Then there was, besides, the red lantern on the platform, which he also saw, and which he acknowledges was a signal of danger, a warning to keep away, to stop and inquire; and excuses himself by accusing himself, saying that he knew it was a signal of danger, but did not know what kind of danger. Yet he was most familiar with the movements of all cars in the station, switching daily over every track. Then, he neither gave a signal nor received one from anyone connected with the C., H. & D. train. He saw the car inspector with his torch, and did not know whether the inspection was over or not. Again, he had no order to couple a car to the Cincinnati train; the Monon telegram by which he was governed merely informed appellee's

yardmaster that such a car was coming for Cincinnati. This was a very different thing from an order to couple to a train without asking the trainmen's permission. Yet, with all this, and with his experience in and around the Union Station, he ran headlong into the Vandalia sleeper, with sufficient force to lock the automatic couplers. That no custom justified this unlicensed coupling, appears from the fact that two cars, from two other roads, stood already, uncoupled, at the rear of train 33, to be coupled by backing up the engine of that train when its crew were ready to do so. At most, the telegram would have authorized the switching crew to run in the extra sleeper on the C., H. & D. track, and leave it standing there, with the two other uncoupled cars, to be coupled, by the C., H. & D. crew when it got ready.

The main contentions of appellee's counsel are thus shown to be without any substantial foundation. And, indeed, the principal opinion would appear to concede that appellee's argument is without merit, in so far as it seeks to uphold the decision of the general term of the superior court. But the majority opinion discovers material for reversing the decision of the special term, or trial court, in the concluding part of the fourth instruction given by the court. This does seem to me to be a most technical reason for overthrowing a meritorious judgment. Nor do I think that the instruction will reasonably bear any such construction as that placed upon it in the opinion. The part of the charge objected to amounts, as I think, to nothing more than saying to the jury: If you find from the evidence that a red light by night is known by railroad employes as a signal of danger; and if you find that such red light was placed upon the rear platform of the car under which Abbitt was at work, and was there seen by appellee's

employes as they pushed up their car against it, and that they knew at the time that such light so placed was a signal of danger, then it was their duty to heed such signal and to act with care and caution in its presence, even though they did not know at the time what the particular danger was.

With all respect for the opinion of the majority of my brethren, I am quite unable to see that any adequate reason is given to show that this instruction does not state the law correctly. The opinion admits, as indeed the record clearly shows, that there was evidence to which the instruction was applicable, that is, that the red light so placed was a signal of danger, and was known to be such by appellee's employes at the time they ran their car against the one under which Abbitt was at work. Surely it is not the law that one who perceives a signal of danger is under no obligation to heed the signal and to act with care and caution when he sees it.

Nor is it any objection to the instruction that there was some evidence to the effect that a red light, so placed as this was, is not a signal of danger. The court plainly states the condition under which the instruction was given: "If you find from the evidence in this case, that a red light by night is a danger signal." There was evidence before the jury, evidence in super-abundance, to say nothing of common knowledge, that a red light at night is used as a danger signal. The court was, therefore, fully justified in giving the instruction, as thus applicable to evidence before the jury. If there was other evidence introduced that would justify the jury in finding that a red light so placed was not a danger signal, then it was the business of appellee to ask the court to give instructions applicable to its own theory of the case. Appellee has no right to object to the instruc-

Pittsburgh, etc., R. W. Co. *v.* The Town of Crown Point *et al.*

tion given, and which is fully and completely applicable to evidence before the jury. The very wording of the italicized part of the instruction, as copied in the principal opinion, is itself a complete refutation of all that is there said against its correctness.

I cannot avoid the conclusion that a grievous wrong has been done in seizing upon so slight a technicality to set aside the deliberate verdict of the jury and the judgment of the trial court.

McCabe, J., concurs in the dissenting opinion.