## J. ROSENBAUM GRAIN CO. v. MITCHELL.

(Court of Civil Appeals of Texas. Texarkana. Dec. 7, 1911. Rehearing Denied Jan. 4, 1912.)

1. RAILROADS (§ 275*)—INJURIES—TRESPASSER OR INVITEE.

Where a railroad company kept a track leading to defendant's elevator in repair, and was authorized to switch cars consigned to defendant thereon to and from such track, and to

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

send its inspectors to inspect and make light repairs on cars standing on such track, an inspector repairing a car on such track was neither a trespasser nor a mere licensee, and defendant owed him the duty of exercising ordinary care to avoid injuring him.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 873–877; Dec. Dig. § 275.*]

**2. RAILROADS (§ 275*) — INJURIES — PERSONS WORKING ABOUT CARS.**

Where defendant elevator company released empty cars, and permitted them to run down its spur track, and collide forcibly with other cars set lower down the track, either with or without knowledge that the cars were habitually inspected and light repairs made thereon by the railroad company's employés while on such track, and plaintiff, a car inspector, was injured while under one of the cars, defendant was chargeable with actionable negligence.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 275.*]

**3. RAILROADS (§ 279*) — INJURIES — PERSONS WORKING ABOUT CARS—CONCURRENT NEGLIGENCE.**

Plaintiff, a car repairer and his helper, went to an elevator siding to make repairs underneath cars which had been dropped down from the elevator, plaintiff directing his helper to watch for other cars which might be let out of the elevator while plaintiff was underneath the cars, in accordance with a custom between them. The helper failed to notify plaintiff of the approach of a car from the elevator, and plaintiff was injured by a resulting collision. *Held*, that the negligence of plaintiff's helper was concurrent only, and did not relieve defendant from liability for the result of its negligence.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 901; Dec. Dig. § 279.*]

**4. NEGLIGENCE (§ 89*)—JOINT ENTERPRISE—IMPUTED NEGLIGENCE.**

Where plaintiff and his helper went to a switch track leading to defendant's elevator to repair cars thereon, and, while plaintiff was under one of the cars, the helper failed to perform his duty to warn plaintiff of the approach of other cars from the elevator, the relation of principal and agent did not exist between plaintiff and his helper, nor was there such a joint enterprise between them that the helper's negligence would be imputed to plaintiff so as to preclude his recovery for the actionable negligence of the elevator company.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 130–137; Dec. Dig. § 89.*]

**5. RELEASE (§ 29*) — SCOPE—JOINT WRONGDOERS.**

Plaintiff, a car repairer, was injured while repairing a car on an elevator switch track by the negligence of the railroad company, and also of defendant elevator company. In order to prevent litigation against it, the railroad company paid plaintiff $4,000, taking a release in behalf of itself "and other companies whose lines are owned and operated by it," releasing them from all liability and all claims arising out of such injury. *Held*, that the court properly charged that if the railroad company's claim agent offered plaintiff $4,000 to release his claim as against the railroad company only, and at the time represented to plaintiff that he had no connection with defendant elevator company, and that the agreement would not release plaintiff's claim or affect his rights against the elevator company, then the release was not a discharge of the elevator company's liability, and plaintiff was entitled to recover

against it full damages, less the amount he had received from the railroad company.

[Ed. Note.—For other cases, see Release, Cent. Dig. §§ 64–70; Dec. Dig. § 29.*]

Hodges, J., dissenting.

Appeal from District Court, Tarrant County; W. T. Simmons, Judge.

Action by John Mitchell against the J. Rosenbaum Grain Company. Judgment for plaintiff, and defendant appeals. Affirmed.

The main track of the Chicago, Rock Island & Gulf Railway Company in North Ft. Worth ran north and south. East of this track, and connecting with it, that company owned and used in the operation of its line of railway three other tracks, known as Nos. 1, 2, and 3. East of those three tracks, and connecting with them, appellant owned three tracks, known as Nos. 4, 5, and 6. No. 5 ran through a grain elevator owned and operated by appellant, and connected with the railway company's tracks to the north of the elevator, and also with its tracks to the south of same. Track No. 5 was on a grade inclining from north to south, so that cars moved on it north of the elevator, if not held by brakes or otherwise, of their own momentum would run down to and through the elevator and on to the south of same. It was used by appellant as an unloading track. A car to be unloaded at the elevator by an arrangement between appellant and the railway company would be set by the latter's switch engines on the track north of the elevator, and, when appellant was ready to unload it, the brakes thereof would be released, and the car started to moving. Appellant's employés would stop it in the elevator, unload it, and then start it to moving south. The practice was to stop and set two or three of the unloaded cars after they passed out of the elevator the desired distance south, and then to permit other cars as they were unloaded to drop down from the elevator of their own momentum and bump against the set cars, so as to shake loose grain lodged in portions of the cars, which could not be otherwise removed therefrom. When a number of the cars had been so unloaded and dropped down the track, they would be removed therefrom by the railway company's switch engines. Appellee was a car inspector in the employ of the railway company. A part of his duty, the jury might have found from the testimony, was to inspect and make light repairs of cars on track 5 after they had been unloaded. About 5 o'clock of the afternoon of a day in December, 1907, while appellee was under one of the unloaded cars which had been dropped down from the elevator, engaged in making a light repair on same, appellant permitted another or other unloaded cars to drop down from the elevator and to collide with the car appellee

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

was under, causing it to move further south, and thereby to so injure appellee as to necessitate the amputation of one of his legs. Negotiations between him and the railway company afterwards resulted in the railway company's paying him $4,000, and his execution of a release as follows:

"Rock Island Lines.

"File No. A1568.           Southern Division.

"General Release.

"Whereas I, J. R. Mitchell, of the county of Tarrant, state of Texas, was injured at or near Ft. Worth, Texas, on or about the 4th day of December, 1907, on a line of railway owned or operated by the Chicago, Rock Island & Gulf Railway Company, while repairing cars near elevator No. Ft. Worth, Texas, cars were dropped against cars I was working on, cutting off right leg, under circumstances which I claim rendered such company liable in damages, although such liability is denied by such railway company, and the undersigned being desirous to compromise, adjust, and settle the entire matter:

"Now, therefore, in consideration of the sum of four thousand dollars ($4,000.00) to me this day paid by the Chicago, Rock Island & Gulf Railway Company, in behalf of itself and other companies whose lines are owned or operated by it, I do hereby compromise said claim and do release and forever discharge the said Chicago, Rock Island & Gulf Railway Company, and all companies whose lines are leased or operated by it, their agents and employés, from any and all liability for all claims for all injuries, including those that may hereafter develop as well as those now apparent, and also do release and discharge them of all suits, actions, causes of actions and claims for injuries and damages, which I have or might have arising out of the injuries above referred to, either to my person or property, and do hereby acknowledge full satisfaction of all such liability and causes of action.

"I further represent and covenant that at the time of receiving said payment and signing and sealing this release I am of lawful age and legally competent to execute it, and that before signing and sealing it I have fully informed myself of its contents and executed it with full knowledge thereof.

"Given under my hand and seal this 2nd day of Jany., A. D. 1908.

                            his
          "J. R.    X    Mitchell.
                           mark
"In presence of:
    "Maggie P. Kirk.
    "W. C. Duringer.
"Paid by draft No. 1237 drawn by W. P. Williams."

Afterwards appellee brought suit against appellant, said railway company, and one Hall. He dismissed his suit as to Hall.

The court peremptorily instructed a verdict in favor of the railway company, and submitted the case as between appellant and appellee to the jury. They found in appellee's favor for the sum of $6,000, and appellant prosecuted this appeal.

Capps, Cantey, Hauger & Short, for appellant. W. P. McLean, R. L. Carlock, N. H. Lassiter, and Robert Harrison, for appellee.

WILLSON, C. J. (after stating the facts as above). [1, 2] Appellant requested the court to instruct the jury to return a verdict in its favor. The refusal of the request is complained of as error. In support of its complaint, appellant insists that, taking the view most favorable to appellee warranted by the testimony, he was a mere licensee while on its premises, and therefore that the only duty it owed to him was to refrain from intentionally injuring him while he was thereon, or, if it discovered him to be in a place of danger on account of cars moving from the elevator south on track 5, to use ordinary care to so manage such cars as to avoid injuring him. We think the testimony warranted a finding that appellee was not a mere licensee while engaged in inspecting and making light repairs of cars on track 5. It was shown that the railway company kept the track in repair for the operation of its cars and engines thereon, and not only was authorized, but was required, by the arrangement existing between it and appellant, to go on the track with its switch engines for the purpose of placing thereon cars of grain consigned to appellant, and for the purpose of removing such cars after they had been unloaded by appellant. It might very well be said, if there was nothing in the record showing that such a right had never been exercised by the railway company, that a right in it to inspect cars and make light repairs thereof while on the track should be implied from the duty it had assumed, for appellant's benefit as well as its own, it may be observed, of removing cars, when unloaded, from the track; for, obviously, both the railway company and appellant, when they entered into the arrangement which bound the former to remove unloaded cars from the track, must have contemplated that it might become absolutely necessary to inspect and repair cars before they could be removed. But it appears from the record that the railway company during a long period of time had exercised such a right, and that its inspectors, almost daily, without objection on the part of appellant, had inspected and made light repairs of cars on that track; and, further, that appellant's superintendent in charge of the work at its elevator knew of the practice, at least so far as the inspecting of the cars was concerned. From such circumstances a jury would be warranted in finding that appellee was not a bare licensee while on appellant's premises engaged in repairing the car, but that

he was there lawfully, in the discharge of a duty he owed to the railway company, the performance of which would inure to the benefit of appellant, also, and which it had agreed might be performed there. If appellee was rightfully upon appellant's premises, it owed him the duty to exercise ordinary care to avoid injuring him while he was engaged in repairing the car. The testimony was sufficient, we think, to support a finding that it did not use such care. The jury might have inferred from the opportunity the testimony showed appellant to have had to know of it that it did know, not only that the railway company's employés inspected empty cars on the track, but that they also made light repairs thereof while on the track. And, if such an inference was not permissible, we nevertheless would not be prepared to say that the testimony was not sufficient to support a finding of negligence on its part; for, if appellant did not know and should not be chargeable with knowledge of the fact that such repairs were habitually made by the railway company's employés on the track, it did know, as testified to by its superintendent, that the railway company's employés inspected cars while on the track in question. It is a matter of common knowledge that in inspecting railway cars persons engaged in that duty go between and under the cars they are inspecting, and so place themselves in positions of danger from collisions between cars they are inspecting and other cars which may be moved on the track. The testimony was uncontradicted that appellant permitted the colliding cars to move down from the elevator and strike the car appellee was under with great force, without doing anything to warn employés of the railway company who might be engaged in inspecting same of danger they might be in from the collision it knew would occur. Whether a reasonably prudent person under the circumstances would have acted as it did we think was a question for a jury, and not for the court, to determine.

[3, 4] In support of its complaint, appellant further insists that its negligence, if any, was a remote cause, and that negligence on the part of one Jones, who was associated with appellee in the work of inspecting and repairing the cars, was the proximate cause of the injury to appellee. Appellee as a witness testified as follows: "I do not know exactly where Jones was, but he jumped out on the other side of the car, and I supposed he was over there. I wanted him to be looking out for me for anything above that might happen to come down. He should have been out there on the lookout for me. He was supposed to be. I depended on him to be out there watching for me. I expected, if any car would drop down there, he would notify me, and that is what I depended upon. When I went in a dangerous place under a car, I depended on Jones giving me notice if any cars were dropped out to come down there. I expected him to notify me. He did not do so. I did not hear him do so. He was not standing there doing as he should have done, I don't suppose, nor did he claim to have been. I knew that was a dangerous place to go under. As to knowing or not that the rules required me to keep somebody looking out, I will say there was not anything in the rules to that effect. We did, that among ourselves. We adopted that rule among ourselves. We had that rule among ourselves, that, if I went under a car, Jones should keep watch and should notify me. I did not know that these cars were frequently coming down there from the Rosenbaum elevator any more than Jones told me they were on No. 5. Jones had told me they did on No. 5. He told me they came down on No. 5. I suppose they used No. 5 for an unloading track for the elevator. I don't think they were unloading 40 to 70 cars a day there on that track. I do not think so, because I do not think they handled that many cars. Jones did not tell me how many were coming down there. I had never seen any come down on No. 5, but I had on No. 6 and No. 4. I had not been at work there a great deal. * * * Probably I would not have gone under there if I had not had Jones there to keep a watchout for me. I did depend upon Jones. I don't know as it was Jones' fault. I could not say. He didn't tell me. I was expecting him to tell me; but I could not say, if I depended upon him, that his failure to tell me was the occasion of my getting hurt. I was expecting Jones to holler if anything came, and, if he had hollered, I would have got out. I did not hear him holler, and did not get out. I did not hear any one holler. I depended on Jones to holler or speak to me if any danger came, but I do not know as his failure to holler was the reason I did not get out. I could not say exactly what was the reason. I would have been out in about a minute, anyway. I just had about a minute's work under there."

Jones testified that at the time the collision occurred he was at work on the inside of a car north of and adjoining the one appellee was under. It is clear, we think, that if Jones was negligent in failing to perform a duty he owed to appellee, and if appellant also was negligent, their negligence was concurrent, and that the negligence of the former was no answer to appellee's suit against the latter (Railway Co. v. Swinney, 34 Tex. Civ. App. 219, 78 S. W. 547; Railway Co. v. McLain, 80 Tex. 85, 15 S. W. 789; Railway Co. v. Bell, 5 Tex. Civ. App. 28, 23 S. W. 922; Railway Co. v. Mackney, 83 Tex. 410, 18 S. W. 949); unless, as is further contended, Jones' negligence should be imputed to appellee. The theory upon which it is claimed that negligence of Jones should be imputed to appellee is that they were engaged in a joint enterprise

and occupied towards each other the relation of principal and agent. Abbitt v. Railway Co., 150 Ind. 498, 50 N. E. 729, decided by the Supreme Court of Indiana, cited by appellant, was a case very much like this one. There it appeared that Abbitt and one Lichstein worked together as car inspectors, and that it was the duty of one while the other was under a car to keep a lookout for other cars which might be moved on the track, and to warn him of danger from a threatened collision between the car he was under and such other cars. Abbitt, while under a car inspecting it, was killed as the result of such a collision. There was testimony tending to show that Lichstein had failed to perform his duty to keep a lookout for and warn Abbitt of the approach of the colliding cars. The court said: "It may be affirmed as a correct doctrine, under the authorities, that if Abbitt and Lichstein were associated together in their work of car inspection at the time of the accident, and if by any arrangement, understanding, or agreement between them, either express or implied, it became Lichstein's duty, when Abbitt was under a car upon the railroad track during the inspection or work performed by them, to look out for approaching trains or cars, and either signal them to stop or warn Abbitt of their approach, then, in this respect, and to this extent, at least, Lichstein might be said to have been serving the former, and under such circumstances the relation of principal and agent in this regard could be said to exist between them; and if Lichstein neglected to discharge the duty so imposed upon him, and thereby contributed to the accident in question, such negligence in legal contemplation would be the negligence of Abbitt, and justly imputable to him. Or, in other words, if, under the circumstances, at the time of the fatal accident, Abbitt attempted or undertook to exercise the care which the law exacted of him through the agency of Lichstein, then it would be incumbent upon the plaintiff in this action to show at the time of the accident freedom from contributory negligence on the part of Lichstein." The value of the decision as authority is weakened by the fact that two of the five judges composing the court dissented, and in a strong opinion combatted the conclusion reached by the majority that the principle in question was applicable to the case. We have not been referred to, and have not found, a case decided by the courts of this state with facts like this one, where the principle invoked has been applied. In several such cases, distinguishable from this one on their facts, the principle has been recognized, however. For instance, in Railway Co. v. Kutac, 72 Tex. 643, 11 S. W. 127, where the plaintiff's decedent while riding in a wagon with her husband and other parties was killed as the result of a collision at a point where the

defendant's railway crossed a public road, between the wagon and one of defendant's locomotives, the defendant contended that negligence of the driver of the wagon should be imputed to the decedent, and that a recovery against it because of its negligence therefore should be denied. The contention was overruled on the ground that the decedent was at the time a mere guest in the wagon, but in discussing the question made the court said: "Applied to private carriers, the rule is said to be that, if the relation of joint enterprise or of master and servant exists, then the negligence of one joint enterpriser or servant is imputable to the other joint enterpriser or to the master." In Johnson v. Railway Co., 2 Tex. Civ. App. 142, 21 S. W. 276, the Kutac Case was cited as establishing in this state that the principle was applicable in such cases. In the Johnson Case plaintiff's decedent, who was blind, was sitting in the rear end of a wagon leading a horse as the wagon, driven by his father, crossed the defendant's track. The horse became frightened, and, pulling back, caused the decedent to fall from the wagon to the track, where he was run over and killed by one of defendant's handcars then being operated thereupon. Decedent and his father were going in the wagon after water for their joint use, and also to water the horse decedent was leading, which was their joint property. In an opinion reversing a judgment in favor of the defendant, with reference to the principle invoked here the Court of Civil Appeals said: "If the jury should find that deceased and his father were engaged in a joint undertaking, it is settled in this state that each would be responsible for the negligence of the other"—citing the Kutac Case, supra. In Garteiser v. Railway Co., 2 Tex. Civ. App. 236, 21 S. W. 633, the plaintiff had been employed by one Heinemann, who had a contract with defendant to do the work, to assist in fencing its track. The plaintiff was injured as the result of a collision between one of the defendant's trains and a handcar which had been furnished by the defendant to Heinemann for use while engaged in his work of fencing the track, and on which plaintiff in the discharge of his duty to his employer at the time was riding. It was insisted that negligence of Heinemann, who was riding with the plaintiff on the car, should be imputed to the plaintiff in favor of the defendant. The Court of Civil Appeals, with reference to the insistence, said: "The American doctrine, as settled by the great weight of authority, is that the negligence of another person, not participated in by the plaintiff, will not be attributed to him, unless he has some right of control over such person, or they are, on terms of equality, engaged in a joint enterprise"—citing the Kutac Case. The cases referred to are the only ones in this state to which we have been cited as supporting appel-

lant's contention. It will be noted that the ruling in the Johnson Case was based upon the Kutac Case, which was regarded by the Court of Civil Appeals as settling the doctrine to be in this state as it was stated to be in the Johnson Case; and it will be noted that the doctrine not only was not settled, as claimed, in the Kutac Case, but that it was not otherwise than tacitly approved. It also will be noted that the Kutac Case was relied upon by the court in the Garteiser Case as authority for saying that the doctrine was recognized in this state. In his work on Negligence, Judge Thompson says: "There is some small authority in support of the proposition that the negligence of one of two joint undertakers may be imputed to the other, the governing principle being that each is the agent of the other"—citing the Johnson and Abbitt Cases, supra, a Nebraska case and a decision of an inferior court in New York. 1 Thomp. Neg. § 506. In 2 Labatt, Mast. & Serv. § 482, it is said: "The right of action in cases where the action is brought against a stranger, and the defense is that the injury was partly caused by the negligence of the plaintiff's own fellow servant, is usually discussed with reference to the doctrine of imputed negligence; the accepted theory of late years being that the defense in question is not a bar to the action, for the reason that the negligent servant is not the agent of the injured servant in such a sense that the latter can be made responsible for the defaults of the former."

The writer of the note to Schultz v. Railway Co., 8 L. R. A. (N. S.) 597, where the authorities are collected, concludes the note by saying: "Associates in a joint enterprise are mutually answerable for each other's conduct. If, therefore, one of them is negligent to the injury of his colleagues, the latter cannot recover of outsiders whose concurrent negligence united to produce such injuries. This is also a doctrine of general acceptation; but it must be said, however, that the courts manifest some disposition to exclude as many cases as possible from the category of joint enterprises, so that it is no easy task to determine whether or not a joint enterprise exists in any given case." The disposition of the court referred to, when it is possible to do so to exclude from the operation of the rule, as it is ordinarily stated to be, cases which might be treated as within its letter, evidently is due to the fact that many such cases are, as we think this one is, entirely without its reason. Doubtless it is right to say that a person injured as the result of negligence on the part of one of several joint enterprisers while engaged in the prosecution of the enterprise shall have a right of action, not only against the negligent joint enterpriser, but also against his associates in the enterprise, who may not have been negligent; and doubtless it is right, also, to say that a person injured

as the result of negligence of an agent while engaged in the performance of his principal's business shall have a right of action against the principal, though he has not been negligent. The justification for so saying in such cases lies in the duty of the innocent joint enterpriser in the one case and of the principal in the other, to so transact his business, or have it transacted, as not to injure innocent third persons. If, however, the effort is not to hold the joint enterprisers or principal liable to a third person for a wrong done him in the furtherance of such joint enterprisers' or principal's business, but is, as here, to hold the third person liable for a wrong he has done an innocent joint enterpriser or principal, the situation is different. To say, as we are asked to say, that the third person whose negligence has resulted in injury to the principal or joint enterpriser innocent of any wrong shall escape the consequences of his wrong, merely because the agent or another joint enterpriser was guilty of negligence which concurred with that of the third person in producing the wrong, we think would be unreasonable. To so hold would have the effect to relieve the wrongdoer of consequences of his wrong which should be visited upon him, and to visit same upon the innocent subject of his wrongful conduct. For here it is not pretended that appellee in relying upon Jones to keep a lookout and warn him was guilty of negligence. The contention is that Jones was negligent, and that because he was appellant should be relieved of the consequences—to appellee, not to Jones—of its negligence. No reason has been, and we think a satisfactory one cannot be, suggested why such a holding should be made. We are of the opinion, and so hold, that the facts of the case do not exclude it from the general rule, which has been stated to be that, "when one has been injured by the wrongful act of another, to which he has in no respect contributed, he is entitled to compensation in damages from the wrongdoer." Fields, J., in Little v. Hackett, 116 U. S. 366, 6 Sup. Ct. 391, 29 L. Ed. 654. We do not think the conclusion reached is in conflict with any ruling made in the Kutac Case or in the Garteiser Case cited. So far as it may be in conflict with the ruling in the Johnson Case referred to, the explanation is that we refuse to follow it. Associate Justice Hodges is of the opinion that the negligence of Jones should be imputed to appellee, and dissents from the holding made to the contrary.

[5] In the release set out in the statement it will be noted there is a recital that the consideration therefor was paid by the railway company "in behalf of itself and other companies" whose lines it owned or operated, and that, by the terms thereof, it was to operate, not only in favor of the Chicago, Rock Island & Gulf Railway Company, but also in favor of all lines leased and operated by it. The contention is made that track 5

belonging to appellant was a line operated by said railway company, and therefore that the court should have construed the release as a discharge of appellant of any liability it had incurred to appellee, and for that reason should have instructed the jury to find for appellant. Appellee pleaded, and there was testimony to support the plea, that the sum paid to him by the railway company was not paid as a satisfaction in full of damages he claimed, but only as a satisfaction thereof in part, that the "real object," quoting from the supplemental petition, "purpose, and intention of the said transaction and the said paper executed by him to the said railway company was that the same was simply to release the said railway company from any suit on his part growing out of said accident, and that the said money so paid to him was to be accepted by him in part satisfaction of his said claim, and that he should have and reserve to himself under the said settlement all his rights as against the said grain company." He further pleaded that, so far as the release executed by him evidenced a contrary intent or purpose, it was the result of mistake or of a fraud practiced upon him by the railway company's claim agent who drafted it. With reference to the release the court instructed the jury as follows: "If you believe from a preponderance of the evidence that the railway company's claim agent, Williams, offered to pay plaintiff the sum of $4,000 to release his claim as against the said railway company only, and if you further believe that the said claim agent did at said time represent to the plaintiff that he had no connection with the defendant grain company, and was representing alone the interests of the said railway company, and, further, that the said claim agent represented that the said agreement would not release the plaintiff's claim or affect his rights as against the said grain company, and if you further believe that the plaintiff agreed to accept the said sum of $4,000 from the said claim agent for said purpose and upon said representations, and if you further believe that it was the agreement between the said parties at said time that the said written instrument should reserve the rights of the plaintiff as against the said grain company, if any he had, and that the plaintiff at the time he signed the said written instrument believed and understood that such clause or provision was contained therein, and if you further believe that the same was not contained therein, but was omitted therefrom, either by the mistake of said parties, if any, or by fraud, if any, on the part of the said claim agent in not so inserting said provision in said instrument, and if you further believe that the plaintiff would not have executed the said release had he known that the said provision was not contained therein, and if you further find and believe that it was the intention of the said parties that the said sum of $4,000

should not be accepted in full settlement of the plaintiff's entire claim for damages growing out of the said accident, but was only intended as a part settlement thereof and for the purpose of releasing the plaintiff's claim as against the said railway company only, and if you further believe that the plaintiff did not in fact accept $4,000 in full settlement of his entire claim for damages on account of said accident, then, if you so find and believe, you will find that the said release executed by the plaintiff to said railway company would not be available as a defense to the plaintiff's suit against the said defendant grain company, and, if you so find, your verdict will be for plaintiff on this issue, save and except that in the event you should find for the plaintiff on the whole case that you will credit the total amount of damages, if any you find for the plaintiff, with the said sum of $4,000 so received by him from the said railway company. If you do not find for the plaintiff under the above instruction, then your verdict will be for the defendant on the said plea of release and settlement, irrespective of any other issues in the case." In El Paso & S. R. Ry. Co. v. Darr, 93 S. W. 169, the release of the plaintiff was to the G. H. & S. A. Railway Company as a joint tort-feasor. It was stipulated in the release that it should not affect any claim the releasor might have against any other company growing out of the accident; but it was further stipulated therein as follows: "Said sum is accepted by the undersigned in settlement for all damages, injuries, and disabilities which may hereafter result from said accident, as well as for those now known to have been caused thereby. It is expressly understood and agreed that said sum is paid and accepted, not only for time and wages lost, expenses incurred, and property destroyed, but also in full and final settlement of all claims of every nature caused by said accident." It was contended that the instrument operated, not only to release the G. H. & S. A. Railway Company, but the El Paso & S. R. Railway Company also. The Court of Civil Appeals overruled the contention, and in the course of its opinion said that "parol evidence as to what was the intention of the parties to the release was clearly admissible." Continuing, the court said: "Whenever it is admitted that parol evidence can be used to explain the intention of the parties to a release of a joint wrongdoer, and that such intent will prevail, the doctrine that the release as to one wrongdoer acts as a release as to joint wrongdoers must of necessity fall to the ground, when the intention was not to release all of them." The material difference between the release in that case and the one in this one is that in the one in that case, while it was recited therein that the sum paid the releasor was "in full and final settlement of all claims of every nature caused by said accident," it was stipulated that it

should not operate to affect any claim the releasor had against any other company growing out of the accident. The Supreme Court refused a writ of error in that case, and in view of the holding thereby approved, that parol evidence is admissible to show the intention of the parties to such a release, we think the assignment attacking the action of the court in instructing the jury as set out, as well as other assignments relating to the release, should be overruled.

The record on this appeal consists of 615 pages of typewritten matter. Many other questions than those discussed are presented in a brief by appellant of 161 printed pages, replied to by a brief by appellee of 73 printed pages. Merely to state those questions and the contentions with reference to them would extend this opinion to an unreasonable length. We have considered all the assignments and the numerous propositions under them, and are of the opinion that no one of them, when viewed in connection with the record, presents a reason why the judgment should be reversed. Therefore it is affirmed.

HODGES, J. (dissenting). I differ from my associates as to the disposition that should be made of this case, and shall here state my reasons.

It must be borne in mind that at the time Mitchell was injured he was engaged in the service of the Chicago, Rock Island & Gulf Railway Company as a car inspector, and sustained no business relations toward the appellant, and for that reason the issue of liability is not to be determined by the rules of law applicable exclusively to the relation of master and servant. The place where Mitchell was at work was on the private premises of the appellant grain company, and no express authority is shown allowing him or other employés of the railway company the privilege of going there to perform the character of work in which Mitchell was at the time engaged. I do not think the facts justify the conclusion that Mitchell was more than a mere licensee, or that he was performing a service which in any manner inured to the benefit of the appellant. It is true there was an agreement between the railway company and the appellant by which the former did all the switching for the latter, but this consisted only in placing cars at the north end of appellant's private tracks, and in taking them away from the south end after they had been passed through the elevator and loaded or unloaded. The evidence shows that, where these tracks lay, there was a sufficient declivity in the surface of the earth to cause cars to roll from the north end of the switch through the elevator to the south end by gravitation, and that this was the usual method of handling the cars that were used in the business of the appellant over its switch tracks. There was no evidence showing that the grain company owned any cars, or had any interest in those which its employés handled in loading and unloading grain. Neither is there any evidence showing that any repairs on any of the cars were needed in order to enable the railway company to remove them from those switch tracks in compliance with its engagement to do appellant's switching. On the contrary, it appears from the statements of all the witnesses who testified upon that subject that the inspection and repairs were done at that place solely as a matter of convenience to the railway company or its employés. The witnesses all say that only light repairs were made there; that, when heavy work was required, the cars were taken to another place.

There was testimony going to show that the managing officers of the grain company would not have permitted the use of its tracks for inspecting and repairing cars had they known it was being done. But there was other testimony tending to show that such work had been performed by the railway employés for a considerable length of time and under circumstances that would imply knowledge and consent on the part of the officers and employés of the grain company. If Mitchell was upon the appellant's premises merely by its implied consent, and was performing a service exclusively for the benefit of another party, the extent of his rights would be those of a licensee only. The general rule is that a licensee must take the premises as he finds them, and subject to the use which the licensor makes of them in the conduct of his business. That rule, however, does not relieve the licensor, when operating dangerous machinery, from the duty of exercising a proper degree of care to avoid injuring those who go there by his permission. Nor is the licensee relieved of the duty of exercising a proper degree of care to guard his own safety, taking into consideration the character of the premises and the use ordinarily made of them by the owner. Railway trains and cars, when in motion, are dangerous vehicles, and those in charge of them are at all times required by the dictates of common prudence to take some precautions to prevent collisions and accidents resulting in injury to others. Where injury results from a failure to exercise that degree of care exacted by law under such circumstances, a case of actionable negligence arises, and damages may be recovered, unless defeated by the contributory negligence of the party sustaining the injury. If Mitchell's presence under the car at the time he was injured was known to the appellant's servants, or might have been expected, or if the customary use made of the track was such that they might have expected Mitchell or some of his coemployés to be in situations about the cars making it dangerous to permit collisions between cars, those servants owed the duty of exercising at least ordinary care to give warning of the approach of the car, or to other-

wise avoid causing injury. While the evidence relied on to establish the facts sufficient to charge the appellant with actionable negligence toward Mitchell is not entirely satisfactory to me, I am willing to concede that issue and rest my dissent upon other grounds.

The next question, that of contributory negligence which may be chargeable to Mitchell, offers to me a difficulty of greater magnitude. This defense is presented by appellant in its brief in three different forms: First. By a requested peremptory instruction to find for the defendant, because the evidence showed contributory negligence as a matter of law. Second. By requesting the following special charge: "You are instructed, gentlemen of the jury, that if you believe from the evidence that the plaintiff went under said car with full knowledge of the fact that said track No. 5 was then in use by the grain company, and that cars were being dropped down on said track and bumped against the standing cars there every few minutes, or as rapidly as the same could be unloaded, and the plaintiff knew that occupying a substantially prone position under said car on said track was dangerous and hazardous under the circumstances, and that plaintiff went under there with knowledge of these dangers and knowledge of the conditions and knowledge of the manner in which the grain company was using.said track, and upon the sole reliance and understanding that his coemployé would keep watch and notify him of approaching danger, and voluntarily assumed said risk and hazard in reliance upon said agreement with his said coemployé, and that the same was a risk and hazard incident to the plaintiff's employment, and voluntarily assumed by the plaintiff at the time, then he cannot recover against the defendant grain company, and your verdict will be for the defendant, J. Rosenbaum Grain Company." Third. By assigning error to the giving of the following portion of the court's main charge: "If you find and believe from the evidence in this case that at and prior to the happening of the accident to plaintiff that the plaintiff was negligent either in failing to put up a blue flag in front of the cars upon which he was at work, or in failing to keep a proper and sufficient lookout for the approach of cars, either by himself or by his companion, or in failing to notify the defendant or its employés in charge of said empty cars of his presence upon the said track, or.in the way and manner in which he attempted to do the work at the time of the said accident, and if you further believe that such negligence, if any you find, in any one or all of the foregoing respects, proximately caused or contributed to cause the production of the plaintiff's accident, 'then you will find plaintiff was guilty of contributory negligence, and, if you so find, your verdict will be for the defendant. But, in this connection, you are instructed that if you be-

lieve from the evidence in this case that at the time the plaintiff was injured he was doing or attempting to do the work on said track at the time of the said accident in the way and manner that a person of ordinary prudence under the same or similar circumstances would have done, or attempted to do the same, and if you further believe that the plaintiff did at the time of the said accident, and just prior thereto, exercise ordinary care for one in his circumstances and situation in the performance of the said work, then, if you so find and believe, you will find that the plaintiff was not guilty of contributory negligence, and, if you so find, you will find against defendant on its plea of plaintiff's contributory negligence, and consider the case with reference to the other issues submitted to you in this charge." If there was error in any one of the respects mentioned, it is, I think, sufficiently grave to require a reversal of the judgment.

The testimony shows substantially the following facts: Mitchell was an experienced car inspector, and had been in the service of the Rock Island Railway Company for some time prior to the date of his injury. He was familiar with the premises where he was at work, having performed similar services there on former occasions. On the day of his injury he was directed by his immediate superior, the foreman, to go out on the north side and inspect those cars. To use Mitchell's own language, the foreman said: " 'Go out there and work them bad order cars on the north side by the elevator.' He didn't say anything about what track I was to use. He didn't know what tracks, they were. He didn't say anything to me about taking the usual and ordinary precautions of putting out flags." Upon this occasion Mitchell was accompanied by another railway employé named Jones, and the two were expected to work together, but Mitchell was the "head man." According to the testimony, it was the duty of these inspectors to examine the cars for defects and needed repairs, and to do what they called light repairing, leaving the heavy work to be done at another time and place. Some time during the afternoon on the date of the injury, Mitchell and Jones began inspecting cars on appellant's switch track No. 5. This was called the unloading track, and was used in this manner: Loaded cars were placed on it at the north end of the switch. When wanted, the brakes were released by appellant's employés, and the cars ran by gravitation down to the elevator, where they were unloaded, after which they were rolled on down to the south end, to be carried away by the Rock Island switch engine. The first cars that were run down to the south end had the brakes set on them, and those which came afterward were allowed to bump against the first in order, as the witnesses say, to dislodge the grain

that adhered to the walls and lining of the cars. Several cars had been unloaded, and were standing on the south end of the appellant's switch track No. 5 at the time Mitchell and Jones began their inspection of them. The elevator was not exceeding 100 yards distant, and appellant's employés were plainly seen by Mitchell as they were engaged in the business of unloading cars. Neither Mitchell nor Jones gave any notice of their presence, or of their purpose to inspect those cars on that track. They took no precautions to protect themselves against injury, although they knew that the cars were at intervals being run down on that track. It is true that Mitchell at first denied that he knew that track No. 5 was so used, but on cross-examination, and after repeated efforts to extract an admission to that effect, he finally stated that Jones had told him that cars were frequently coming down on track No. 5 from the elevator. Jones, a witness for appellee, testified that both he and Mitchell knew that cars were likely to drop down from the elevator at any time.

Mitchell thus describes what he was doing, and how he was injured: "The accident occurred to me about 5 o'clock in the day. We went on duty at 1 o'clock in the afternoon. I was at work on track No. 5 when the accident occurred, about five or six car lengths south of the elevator. Had been working on that track about a couple of hours. At the time of the accident I was under the car. There were three or four cars in a string on the track, and I was under the south end of the last car screwing some nuts on a draft bolt. My partner (Jones) was on a car or so above me when they turned a car loose from the elevator, and came down and hit me. My right leg was lying over the rail when the car hit." On cross-examination he said: "All the time I worked there I never saw a car coming down on track No. 5. I am not acquainted over there, and did not know what track No. 5 was for. I did not know exactly what it was for. I had not been working out there long enough to know these things. I had been working there 12 or 15 days, something like 3 weeks. I knew they let cars down on track 4, the loading track. I had seen them do that. I suppose they unloaded on track 5. * * * I had never seen them use any track to unload on. * * * When I went under this car, I saw the Rosenbaum elevator people at work up at the elevator. * * * I never paid any attention to what they were doing. They were running around there, and I suppose their business there was to work. * * * It would have been about 300 feet for me to go where they were unloading cars. I could have walked up there, and told them that I was going underneath that car, and found out for certain whether they were going to turn any cars loose there; but it was not the custom for me to do that, and I did not go."

Mitchell and Jones both testified that there was an understanding between themselves that while doing this character of work when one was under a car the other should keep a lookout for him. This was not a rule of the company, but one of their own making. Mitchell also testified that he knew going under the car was dangerous, and says: "Probably I would not have gone under there if I had not had Jones there to keep watch for me. I did depend upon Jones. I don't know that it was Jones' fault. I could not say; but he didn't tell me, but I couldn't say that if I depended on him that his failure to tell me was the occasion of my getting hurt. I was expecting Jones to holler if anything came, and, if he had hollered, I would have got out. I did not hear him holler, and did not get out. I depended on Jones to holler or speak to me if any danger came, but I do not know that his failure to holler was the reason I did not get out. * * * I could not say exactly what was the reason."

In considering this evidence as bearing upon the care which Mitchell was required to exercise for his own protection, these questions arise: Should we look only to the conduct of Mitchell himself with reference to all his surroundings, including the presence of his fellow workman, Jones, and their mutual understanding about keeping watch under such conditions, and from that conduct alone determine the issue of his contributory negligence? Or should we impute to Mitchell, as a part of that which may justly be chargeable to him under the facts here detailed, any dereliction on the part of Jones which contributed to the injuries sustained? It seems to me that Mitchell's own testimony shows that in going under that car at the time he did, and under the circumstances then surrounding him, he voluntarily assumed a risk too hazardous to comport with ordinary prudence, unless we take into consideration the presence of Jones and his agreement to keep a watch for Mitchell. Notwithstanding Mitchell's apparent evasions, enough was finally elicited from him to show by his own testimony that he was fully cognizant of his surroundings, that he appreciated the danger likely to attend the venture of going under the car, and that he regarded this as too hazardous without having some one to keep a lookout for him. We then have here all the essentials necessary to constitute a well-defined case of contributory negligence if we exclude Mitchell's right to rely upon the understanding with Jones to keep watch. If we recognize that right as a proper element to be considered in testing the prudential quality of Mitchell's conduct on that occasion, we are then brought face to face with the correla-

tive proposition—that of taking into consideration the conduct of Jones and of imputing to Mitchell any negligence of which Jones may have been guilty in failing to keep a lookout. It is upon this proposition mainly that I differ with my associates. Before discussing the principle involved, I shall refer to some of the leading authorities on this subject.

In Little v. Hackett, 116 U. S. 366, 6 Sup. Ct. 391, 29 L. Ed. 652, Justice Field treats the doctrine of imputed negligence somewhat from an historical standpoint. He said: "The leading case to this effect is the case of Thorogood v. Bryan, decided by the Court of Common Pleas in 1849, 8 C. B. 114. It there appeared that the husband of the plaintiff, whose administratrix she was, was a passenger in an omnibus. The defendant, Mrs. Bryan, was the proprietor of another omnibus running on the same line of road. Both vehicles had started together and frequently passed each other, as either stopped to take up or set down a passenger. The deceased, wishing to alight, did not wait for the omnibus to draw up to the curb, but got out while it was in motion, and far enough from the path to allow another carriage to pass on the near side. The defendant's omnibus coming up at the moment, he was run over, and in a few days afterwards died of· the injuries sustained. The court, among other things, instructed the jury that, if they were of the opinion that the want of care on the part of the driver of the omnibus in which deceased was a passenger in not drawing up to the curb to put him down had been conducive to the injury, the verdict must be for the defendant, although her driver was also guilty of negligence. The jury found for the defendant, and the court discharged a rule for a new trial for misdirection, thus sustaining the instruction. The grounds of its decision were, as stated by Justice Coltman, that the deceased, having trusted the party by selecting the particular conveyance in which he was carried, had so far identified himself with the owner and her servants that, if any injury resulted from their negligence, he must be considered a party to it; 'in other words,' to quote his language, 'the passenger is so far identified with the carriage in which he is traveling that want of care on the part of the driver will be a defense of the driver of the carriage which directly caused the injury.'" After reviewing several cases in which the doctrine announced in the case of Thorogood v. Bryan is criticised and repudiated, Justice Field, continuing, said: "Those on a hack do not become responsible for the negligence of the driver, if they exercise no control over him further than to indicate the route they wish to travel, or the places to which they wish to go. If he is their agent so that his negligence can be imputed to them to prevent

their recovery against a third party, he must be their agent in all other respects, so far as the management of the carriage is concerned, and responsibility to third parties would attach to them for injuries caused by his negligence in the course of his employment. But, as we have already stated, responsibility cannot, within any recognized rules of law, be fastened upon one who has in no way interfered with and controlled in the matter causing the injury. From the simple fact of hiring the carriage and riding in it no such liability can arise. The party hiring or riding must in some way have co-operated in producing the injury complained of before he incurs any liability."

The rule, as now recognized by the weight of authority in this country, is thus stated in the Encyclopedia of Law and Procedure: "In order that the concurrent negligence of a third person can be interposed to shield another, whose negligence has caused an· injury to one who was without fault, the injured party and the one whose negligence contributed to the injury must have sustained such a relation to each other, in respect to the matter then in progress, that in contemplation of law the negligent act of the third person was, upon the principle of agency, or co-operation in a common or joint enterprise, the act of the person injured, or the relation of the person injured and the one whose negligence contributed to the injury must have been such that the latter was bound to care for and protect the former." 29 Cyc. 542. Numerous authorities are cited in the notes as supporting the proposition announced. The case of Abbitt v. Railway Co., 150 Ind. 498, 50 N. E. 729, is referred to and discussed in the opinion of the majority. The facts of that case were less favorable for the application of the rule than those here under consideration. It is true, as stated, that two of the five judges dissented, but I think the facts of this case come fully within the principle recognized in the dissenting opinion. In that case the facts showed that Abbitt and another employé, by the name of Lichstein, were together engaged in inspecting cars. At the time of the injury Abbitt was under a car, and Lichstein was standing on the outside near the end, holding a light for Abbitt. While in that position, Abbitt was injured as the result of a collision with another train of cars, caused, it was claimed, by the negligence of the railway employés operating the train. The question about which the judges divided was whether or not the negligence of Lichstein in failing to give notice of the approach of the train should be imputed to Abbitt. The majority of the court held that it should because the two were engaged in a joint enterprise. The minority dissented upon the ground that the facts did not justify the application of the general rule which imputes to one the negligence of

another. The dissenting opinion does not go to the extent of repudiating as a whole the doctrine of imputed negligence in this character of cases, but states the true rule in this language: "It is the duty of each person to take due care, but neither person, unless the relation of agency exists, is responsible for the want of care on the part of another." There was no evidence that there was any agreement between Abbitt and Lichstein that one should keep watch while the other was under a car, or that the injured man in any manner depended upon Lichstein to keep a lookout for him. In that important respect the case differs from this.

The case of Lammey v. Center Coal Mining Co., 144 Iowa, 640, 123 N. W. 356, was a suit to recover damages for the death of an employé caused by the fall of slate in a mine on account of insufficient props. Lammey's son was at the time working with him as his partner, and one of the issues involved depended upon the conduct of the son in taking proper precautions for their safety. The court said: "The failure of the son to get mine props, or to use those which were at his command, should be imputed to the father, and not to the defendant. It was, as the Supreme Court of Ohio said, an error of judgment for which the defendant is not responsible, and this negligence is to be imputed to the father." In the case of N. Y. C. & St. L. R. R. Co. v. Kistler, 66 Ohio St. 326, 64 N. E. 130, suit was brought by a daughter to recover damages for the death of her father due to a collision with a railway train at a public crossing. The facts show that the father was driving a buggy drawn by two horses, that he was very deaf, and it was his custom to carry one of his children along to hear for him. The curtains of the buggy were down, but loose at the bottom. While on the railway crossing they were struck by a train, and the father was killed. In discussing the question of imputing negligence the court uses this language: "While it is true that the doctrine of imputed negligence does not prevail in this state, that doctrine was not applicable to the facts as claimed to be by the defendants in this case, and as the evidence tended to prove. The father, being nearly deaf, took the daughter along to hear for him, and as they came to the west side of the piece of woods he told her to look and listen for trains, and she did so by raising the rear curtain and looking in the direction of the railroad. If it be true that she was to do the listening and also to assist in the looking while he was doing the driving, they were engaged in a joint enterprise, and each would in such case be chargeable with the negligence of the other. It has often been held that the negligence of the servant will be imputable to the master because he is the superior. * * * On principle and sound reason the rule

should be applied to those who take an active part in a joint enterprise." This statement of the rule from the highest court of a state in which the doctrine of imputed negligence is repudiated is, I think, broad enough to include within its application the facts involved in the case now before us. Mitchell was to go into a position where he could not see, and probably could not hear, the approach of a car coming down from the elevator. Relying upon a pre-existing agreement and understanding with Jones to keep watch and warn him, he made the venture. Here Jones was to do the looking and listening while Mitchell did the work under the car. If in the case last referred to the negligence of the daughter was imputable to the father, I see no escape from the conclusion that in this case the negligence of Jones would be imputable to Mitchell.

The holding of our Supreme Court in this state has been referred to and quoted in the majority opinion, and need not be repeated. Johnson v. G., C. & S. F. Ry. Co., 2 Tex. Civ. App. 139, 21 S. W. 274, was a suit in which the deceased was killed by a hand car which ran over him at a road crossing. The deceased was blind and was sitting in the rear end of a wagon which was being driven by his father. The two were going after water, and had some stock carried along to be watered. The facts showed that the father saw the hand car, but drove on across the track. A horse which the deceased was leading became frightened, and pulled back, causing the deceased to fall in front of the hand car. Upon the issue of contributory negligence the court said: "In deciding whether or not the deceased was guilty of contributory negligence in being caught upon the track of appellee, several important questions are presented. In the first place, is negligence on the part of the driver of the wagon to be charged to him? If the jury should find that the deceased and his father were engaged in a joint undertaking, it is settled in this state that each would be responsible for the negligence of the other. Railway Co. v. Kutac, 72 Tex. 643, 11 S. W. 127. And, without undertaking to review the numerous cases in this country discussing the noted English case of Thorogood v. Bryan, we think it is fairly deducible from the authorities that, if deceased was blind, so as to be unable to take care of himself, and of his own volition confided himself to the care of his father, the negligence of such custodian should be imputed to him. In such case he would be his agent." Cin. St. Ry. Co. v. Wright, 54 Ohio St. 181, 43 N. E. 688, 32 L. R. A. 340, is another Ohio case, and in it the Supreme Court of that state quotes with approval the following language of Justice Field in the case of Little v. Hackett, before referred to: "That one cannot recover dam-

ages for an injury to which he has directly contributed is a rule of established law and a principle of common justice. And it matters not whether that contribution consists in his participation in the direct cause of the injury, or in his omission of duties, which if performed, would have prevented it. If his fault, whether of omission, or commission, has been the proximate cause of the injury, he is without remedy against one also in the wrong. It should seem that the converse of this doctrine should be accepted as sound—that when one has been injured by the wrongful act of another, to which he has in no respect contributed, he should be entitled to compensation in damages from the wrongdoer. And such is the generally received doctrine, unless a contributory cause of the injury has been the negligence or fault of some person toward whom he sustained the relation of superior or master, in which case the negligence is imputed to him, though he may not have personally participated in or had knowledge of it." The Ohio court then continues: "This, we think, places the doctrine of contributory negligence upon a sound foundation. In order that it shall operate to defeat a recovery, it should be some act or omission of the party himself, or some one toward whom he stood in the relation of master, or superior."

I do not understand that it is necessary, in order for one to be the agent or servant of the injured party, within the meaning of the rule above announced, that there should be a contract creating the relation of principal and agent, or master and servant; but that it is sufficient if by some voluntary act the injured party adopts the other, even temporarily, as his representative, or substitute, for the performance of the duty, or of exercising the vigilance which prudence demanded of him under the circumstances. The imputation of negligence is made, not because the master, or principal, might have compelled the performance of the service or precaution exacted, but because he had delegated that performance to another. There is much in the evidence to justify the conclusion that Mitchell and Jones were joint enterprisers at the time of the accident. Upon that issue Mitchell said: "While I was screwing the nut, Jones was out on the other side of the car. Jones had put the bolt through from the car, and then went out on the other side, and I supposed that he was over there watching out for me. * * * Where two men are working together in putting a draft bolt in, one goes inside and drives the bolt down and the man on the outside puts the nuts on and screws them up. * * * It is usual that, where one man is under a car and his part-ner is on the outside, the partner is supposed to look out for the man while he is under the car." If, in determining Mitchell's prudence in venturing under the car at the time and under the circumstances then surrounding him, he is to be credited with the presence and promised vigilance of his partner Jones in keeping a watch for cars coming down from the elevator, why should he not be charged with his partner's failure in respect to the duty assumed by him? Upon what principle of justice or rule of law can Mitchell claim the benefit of the one and escape the consequences of the other? The rule making one responsible for the negligence of another into whose keeping he has voluntarily placed himself or his property in my judgment completely covers the facts of this case. The harshness of the doctrine which imputes to one the negligence of a third person is doubtless the reason why courts are disposed to refuse its enforcement, except in that character of cases to which it is now limited. The rule by which the contributory negligence of the injured party alone defeats recovery often necessitates the rendition of harsh judgments. But this rule has been so long established, and is so universally recognized, that no court should feel at liberty to now ignore it without legislative authority. I think the same may be said with reference to the doctrine of imputed negligence within the limits discussed by the cases to which I have referred. The doctrine of respondeat superior rests entirely upon the justice of imputing to the principal or master the culpable negligence of the agent or servant. It is only by imputing to the grain company in this instance the negligent conduct of its servants in causing this particular injury to Mitchell that any liability can be found in his favor.

It may be conceded that the testimony was not sufficient to require a peremptory instruction in favor of the appellant upon the ground that the negligence on the part of both Mitchell and Jones was a concurring cause of the injury; still I think the judgment should be reversed on account of the affirmative error contained in that portion of the main charge of the court which has been previously quoted. In the first portion of that charge, the court intimated to the jury that they might take into consideration the conduct of Jones, as well as that of Mitchell, in passing upon the question of contributory negligence; but in the latter part he excludes any such consideration, and expressly limits the jury to the conduct of Mitchell alone.

. For the reasons stated, I do not concur in the affirmance of the judgment in this case.